No. 19-**3576**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

**IN RE DANIEL LEWIS LEE,**

**Movant.**

FILED

DEC 0 4 2019

MICHAEL GANS
CLERK OF COURT

## APPENDIX TO
## MOTION FOR LEAVE FOR AUTHORIZATION TO FILE A
## SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255

### THIS IS A CAPITAL CASE

AMY DONNELLA
Assistant Federal Public
   Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103
Amy_Donnella@fd.org

GEORGE G. KOUROS
Assistant Federal Public
   Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

RECEIVED

DEC - 4 2019

U.S. COURT OF APPEALS
EIGHTH CIRCUIT

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**DANIEL LEWIS LEE,**
    **Movant**

**v.**

                            **Criminal Case No. 4:97-cr-00243-KGB-2**

                            **CAPITAL CASE**

**UNITED STATES OF AMERICA,**
    **Respondent.**

---

## MOTION TO VACATE CONVICTION AND SENTENCE
## PURSUANT TO 28 U.S.C. § 2255

---

AMY GERSHENFELD DONNELLA
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103
Amy_Donnella@fd.org

GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

# TABLE OF CONTENTS

I.      Introduction .................................................................................1

II.     Procedural History and Facts Relevant To Mr. Lee's Claims................4
        A.      Pre-Trial *Brady* Litigation .........................................................4
        B.      Trial................................................................................................6
                1.      Summary of the Government's evidence at the guilt
                        phase ................................................................................6
                2.      Summary of Evidence of the Existence of an Enterprise...7
        C.      Post-Trial Proceedings................................................................12
        D.      Findings Made on Direct Appeal in Mr. Lee's and Chevie
                Kehoe's Case ................................................................................12
        E.      Facts and Law Underlying the Present Motion...........................15
                1.      Elements (In Addition to Proof of Commission of Violent
                        Crime) Necessary to Prove VICAR Crimes ....................16
                2.      "Enterprise" is Defined Differently for Purposes of
                        RICO, with which Mr. Lee was also Charged,
                        from its Meaning under VICAR:  for RICO an
                        Individual can Suffice; for VICAR, an Enterprise
                        Requires a Group............................................................17
                3.      In Order to Be an Enterprise, this Group Had to Have a
                        Structure or Share a Common Purpose ...........................18
                4.      The Previously Withheld Information...............................19

III.    Claim for Relief .......................................................................24
        A.      Mr. Lee's convictions for the VICAR crimes were obtained in
                violation of *Brady v. Maryland* ...................................................24
                1.      The previously undisclosed evidence was exculpatory ......25
                        a.      In order to establish the alleged VICAR crimes, the
                                Government was required to prove that an enterprise
                                existed at the time of the VICAR crimes, and
                                entered into an agreement with Mr. Lee to commit
                                these specific murders................................................25
                        b.      The previously undisclosed evidence establishes that
                                there was no "group of individuals" associated-in-fact,
                                with a common structure or goal at the time of the
                                Mueller murders, and is, therefore, exculpatory .........27
                        c.      The previously undisclosed evidence establishes that,

i

even assuming Chevie Kehoe agreed to pay Mr. Lee to commit the Mueller murders, he did so in his personal capacity, not as an agent for an enterprise ....29

2. The evidence was suppressed by the Government ............30
3. Withholding this exculpatory evidence prejudiced Mr. Lee..................................................................................34

IV. Conclusion.................................................................................39

A003
Appellate Case: 19-3576    Page: 4    Date Filed: 12/04/2019 Entry ID: 4858509

**MOTION TO VACATE CONVICTION AND SENTENCE
PURSUANT TO 28 U.S.C. § 2255**

COMES NOW Daniel Lewis Lee ("Mr. Lee"), by his undersigned counsel, and hereby moves the Court, pursuant to 28 U.S.C. § 2255, to vacate his conviction and death sentences, on the ground that they were imposed in violation of the United States Constitution and the laws of the United States. Mr. Lee seeks discovery and a hearing on all disputed issues of fact and respectfully reserves the right to amend this motion in accordance with law. Mr. Lee is presently confined on death row at the United States Penitentiary at Terre Haute, Indiana.

## I. INTRODUCTION

In September, 1997, Arkansas state law enforcement agents issued arrest warrants for Chevie Kehoe and Daniel Lee for three counts of capital murder for the killing of William and Nancy Mueller, and Nancy's daughter, Sarah Powell. Over the course of the next year, these state charges were replaced with federal ones. The federal counts alleged that Mr. Kehoe and Mr. Lee were members of an enterprise, established for the purpose of promoting white supremacist, white separatist and anti-government goals, and that the murders were committed by and for the enterprise. These federal capital charges were brought pursuant to 18 U.S.C. § 1959 (Violent Crimes in Aid of Racketeering or "VICAR"). Two other non-capital counts alleged that Mr. Kehoe and Mr. Lee had engaged in a pattern of racketeering activities on behalf of the enterprise and had been co-conspirators in

1

**A004**

Appellate Case: 19-3576   Page: 5   Date Filed: 12/04/2019 Entry ID: 4858509

these racketeering activities, pursuant to 18 U.S.C. § 1962(b) and (c), the Racketeer Influenced and Corrupt Organizations statute more commonly known as RICO.

Unlike the typical RICO and VICAR cases prosecuted by the federal government, which involve large organized crime families, unions infiltrated by corrupt forces, or corporations seeking to gain market advantage through illicit means, the racketeering enterprise charged in the instant litigation consisted of just five people: two brothers and their father (Chevie, Cheyne and Kirby Kehoe), who sometimes earned a living selling guns at gun shows around the country; and two unrelated men (Faron Lovelace and Mr. Lee), who did not meet met each other until they were arrested and held in the same jail prior to the start of the Mueller murder trial.

Proving the existence of an enterprise is an essential element of all the federal statutes Chevie Kehoe and Mr. Lee were charged with violating. Without convincing proof that an enterprise, already in existence at the time of the Mueller murders, had sponsored these killings, the Government would fail in its bid to prove these capital charges beyond a reasonable doubt, no matter how strong the evidence that Mr. Kehoe and Mr. Lee had participated in the Mueller homicides.[1]

---

[1] The evidence tying Mr. Lee to the Mueller murders themselves was weak to begin with and has only gotten weaker in the years since trial.

2

**A005**

Evidence the Government withheld, but recently disclosed by Cheyne and Kirby Kehoe, wholly undermines the Government's VICAR theory and should have been shared prior to trial with Mr. Lee's counsel.   The revelations contained in their attached declarations, provided on November 1 and November 3, 2019, respectively, form the basis for this § 2255 motion, which raises claims of significant and redressable violations of Mr. Lee's due process rights.

Specifically, Cheyne and Kirby Kehoe's declarations establish both that: (a) there was, in fact, no VICAR enterprise at the time of the Mueller murders;[2] and (b) even if an enterprise was legally deemed to have existed, neither that enterprise, nor anyone acting on behalf of the enterprise, entered into an agreement with Mr. Lee to give him anything of pecuniary value in exchange for committing these murders. This newly-discovered information, which Cheyne and Kirby had provided to the Government before trial, went to the heart of two required elements of the VICAR murders and establishes that, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), the Government withheld material exculpatory evidence. Armed with this information, Mr. Lee could not have been convicted of these federally-defined murders.

---

[2] Although it seemed largely overlooked at the time of trial, these elements require temporal findings, as well.  The enterprise and the agreement must have existed at the time of the alleged murders.  They cannot have come into existence after the predicate crimes.

3

**A006**

In the sections that follow, Mr. Lee: (1) recounts the procedural history of this case and facts relevant to these claims; (2) describes in full the undisclosed evidence that undermines the Government's proof of these VICAR crimes; and (3) pleads Mr. Lee's claims that his conviction and death sentence were obtained in violation of *Brady v. Maryland*.

## II. PROCEDURAL HISTORY AND FACTS RELEVANT TO MR. LEE'S CLAIMS.

### A. Pre-Trial *Brady* Litigation

Shortly after their appointment, counsel for Mr. Lee filed several pre-trial motions in the Eastern District of Arkansas district court requesting that the Government reveal all information and material known to it that might be favorable to Mr. Lee on the issue of guilt or punishment pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. Doc. Nos. 28, 31. The Government responded that it "recognize[d] its obligation under *Brady v. Maryland*," and would "provide all *Brady* material as required by law." Doc. No. 55 at 2. The prosecutors further stated that they would "treat this motion as continuing." *Id.*

During a pretrial conference on April 9, 1998, the prosecution represented that the "bulk" of the *Brady* material had already been disclosed to the defense. 4/9/98 Tr. at 32. The Court thereafter entered an order dismissing Mr. Lee's *Brady* motion as moot "[f]or the reasons set forth on the record and in open court" at the hearing, while also directing the Government to provide defense counsel with any

4

discovery to which Mr. Lee was entitled "on a continuing basis as it is received." Doc. No. 145 at 1, 3. The prosecution produced no additional *Brady* material pursuant to this order.

Several months later, after the Government moved to amend its notice of intent to seek a death sentence (Doc. No. 224), counsel for Mr. Lee renewed their requests for *Brady* material as to any issues relevant to sentencing. Doc. Nos. 258, 259, 260. The Government responded that it had nothing further to disclose. Doc. No. 327 at 1; *see also* Doc. No. 288 at 2.

In its subsequent order granting Mr. Lee's request for *Brady* material as to punishment, the district court said:

> In his motion, Defendant Lee asks the Government to provide him with any information in its possession "arguably favorable to the Defendant on the issue of sentencing." Motion at ¶8. The Government has responded, and although it acknowledges its obligation to provide the requested information under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), and its progeny, the Government states that it has already disclosed all such information in its possession. The Government further states that it will confer with counsel to verify that all such relevant documents have been disclosed. Because Defendant Lee is entitled to the requested information and the Government is under a continuing duty to disclose it to him, the Court will grant Defendant Lee's motion.

Doc. No. 344 at 4. The prosecution did not produce any evidence tending to disprove the elements necessary to establish the VICAR counts.

5

### B. Trial

### 1. Summary of the Government's evidence at the guilt phase.

The superseding indictment (Indictment) under which the Government proceeded at trial described an enterprise,[3] identified variously as the "Aryan Peoples' Republic" or the "Aryan Peoples' Resistance" (APR), the purported goal of which, according to the prosecution, was to promote and fund white supremacist goals. Mr. Kehoe allegedly formed the APR in 1993 to establish an independent nation of white members of the Christian Identity faith in the Pacific Northwest. *See United States v. Lee*, 374 F.3d 637, 641 (8th Cir. 2004).

The Indictment identified Chevie Kehoe as the as "the leader of the enterprise [who] functioned as the primary planner and decision maker;" Mr. Lee and Mr. Lovelace as "principal assistant[s] to and associate[s] of Chevie O'Brien Kehoe;" Kirby Kehoe as "a principal assistant to and father of" Chevie Kehoe; and Cheyne Kehoe as "a principal assistant to and brother of" Chevie Kehoe. Count 1 of the Indictment listed ten racketeering acts the enterprise had allegedly committed.

---

[3] The term "enterprise" is defined in both the VICAR and RICO statutes. See subpart E, *supra*. The existence of an enterprise is a required element of both VICAR and RICO offenses. As described *supra*, the definition of enterprise in the VICAR statute (18 U.S.C. § 1959(b)(2) is different from the definition in RICO, 18 U.S.C. § 1961(4), in that an individual can constitute an enterprise under RICO but not under VICAR.

**A009**
Appellate Case: 19-3576    Page: 10    Date Filed: 12/04/2019 Entry ID: 4858509

At trial, prosecutors presented evidence that Chevie Kehoe, his father Kirby Kehoe, Chevie's brother Cheyne Kehoe, Faron Lovelace, and Daniel Lee each participated in some of the racketeering acts listed in the Indictment. Only Chevie was accused of participating in all ten of these acts.

According to the Government, Mr. Lee joined the enterprise in late 1995 or early 1996, when Mr. Kehoe "recruited" him. In January, 1996, Mr. Kehoe and Mr. Lee left the state of Washington, traveled to Arizona for an overnight visit with Chevie's parents, Gloria and Kirby Kehoe, and then traveled to Oklahoma to visit Mr. Lee's mother, who was hospitalized for emergency gallbladder surgery. Tr. 2617. The Government claimed the two men then left Oklahoma on January 10 or 11 and traveled to Arkansas, where they robbed and killed William and Nancy Mueller, and their daughter, Sarah Powell.

The Government alleged that Mr. Kehoe and Mr. Lee carried out the murders on January 11, 1996. Evidence of this came primarily from Cheyne and Gloria Kehoe. Both testified that Chevie Kehoe had separately confessed to each of them that he and Mr. Lee carried out the murders. Gloria also claimed that Mr. Lee confessed his involvement to her. *Lee*, 374 F.3d at 642-43.

**2.      Summary of Evidence of the Existence of an Enterprise.**

As to proving the existence of an enterprise, the Government's relied on an amalgam of witnesses. Although the enterprise purportedly consisted of Chevie,

7

Appellate Case: 19-3576      Page: 11      Date Filed: 12/04/2019 Entry ID: 4858509

Cheyne, Kirby, Mr. Lovelace, and Mr. Lee, Cheyne was the only one of the five called to testify. His testimony consisted largely of describing conversations he had had with Chevie in 1997, when Cheyne's and Chevie's families were traveling together, looking for work. According to Cheyne, he learned for the first time from his brother Chevie in 1997 -- a year after the Mueller murders -- that he wanted to start an organization that would promote separatism, and this organization would be called the APR, alternately referred to as the Aryan People's Republic and the Aryan People's Resistance.  Cheyne testified that Chevie further told him that year that he and Mr. Lee had "recruited" a friend of Mr. Lee's, Jon Cox, to join them in the spring of 1996 (also after the Mueller homicides), and showed him insignia which he claimed represented racial purity. Tr. 5370-74.

Cheyne provided no testimony suggesting that Chevie had told him about the APR prior to these discussions in 1997.[4]

The other testimony came from witnesses not affiliated with the purported enterprise whose evidence also related only to the period following the Muellers' deaths. Very little of it was about Daniel Lee. David Lynch stated that in July,

---

[4] Despite this, the prosecutor's first question to Cheyne about the APR was "During this time [when you were traveling together in 1997, a year after the Mueller murders] did your brother begin talking to you *more* about the APR?"  Tr. 5370 (emphasis added.)  The insertion of the word "more" in this question suggests that Chevie had talked to Cheyne previously about the APR and that Cheyne had already testified to that effect.  But neither of these had happened.

8

1996, six months after the Muellers were killed, Mr. Lee, who he described as a "skinhead," spoke to him about doing "militia-type" work that might make history. Tr. 4416. Jack Price, incarcerated with Mr. Lee in 1997, testified that he gave Mr. Lee a tattoo that represented the themes of the APR, based on drawings Mr. Lee had shown him. Tr. 4115.

Those testifying to Chevie's desire to start an organization also recounted evidence from 1997. Larry McPheron, a cell mate of Chevie's from that year, said he spoke to him at that time "about an organization that [Chevie] was trying to start up." Tr. 4120. Mr. McPheron said it was a white separatist group called the Aryan People's Republic or Resistance, though it was not clear what Chevie wanted to with the organization. McPheron also said Chevie had sketched a symbol of the APR for him on a table. Id.[5]

Glen Jordan, a federal law enforcement agent, conducted a search of a cabin Chevie had lived in in 1997 and found a 7-page note written on yellow post-it notes. It was addressed to Chevie's wife, Karena, referenced the then-recent 1997 shootout in Ohio involving Chevie and his brother Cheyne, and concluded with a

---

[5] Mr. McPheron had written to the Government to offer his help in exchange for a letter of recommendation so he could apply for judicial release. He said he "could probably use it, plus it was offered to me." Tr. 4119

9

drawing of the symbol, earlier described by Jack Price as representing the APR. Tr. 3267. [6]

The prosecution introduced additional evidence that did not mention the APR but intimated that, because the five individuals alleged to be members of the enterprise held racist and anti-Semitic views, they were committing crimes for purposes connected with those views. Gloria Kehoe, Chevie's mother and Kirby Kehoe's wife, talked about a book she saw Chevie give Danny Lee, *The Silent Brotherhood*, that discussed white supremacist themes.[7] Gloria also testified that many people in their circle of acquaintances, including Chevie and Kirby, read and discussed this book, including crimes it mentioned. Tr. 4965. Gloria testified about a variety of different white supremacy and white separatist groups she was aware of and had been exposed to over the course of years. Tr. 4496-5016, 5002-03, 5005, 5016-17, 5025, 5075, 5085, 5104, 5111. She never mentioned the APR at any time in her testimony.

---

[6] Mr. Price had five felony convictions, and four parole violations at the time he testified, for fraud, bad checks and theft. Tr. 4108. He had cooperated with the police by the time he testified here in two other cases, both for racketeering. One also included a murder for hire charge. Tr. 4109. The FBI had paid Mr. Price a relocation fee of $20,000. *Id.*

[7] While Gloria never specified when Chevie gave the book to Mr. Lee, the context makes clear this happened after February, 1996. Gloria first met Mr. Lee in Arizona in early 1996 and did not return to Spokane until early February, 1996. Tr. 4964. Because she said this took place at the Shadows Motel in Spokane, it had to have happened after the Mueller murders, not before.

**A013**
Appellate Case: 19-3576   Page: 14   Date Filed: 12/04/2019 Entry ID: 4858509

Finally, John Shultz and his wife Georgianna Williams testified briefly to conversations they had had with Chevie in 1993, about the values embodied in the Aryan Nations and Christian Identity movements.[8]  According to Mr. Shultz's testimony, Chevie "and most people in the Identity movement" "have conversations quite often" about establishing an Aryan homeland in the Pacific Northwest.  Mr. Shultz attributed these conversations generally to members of the Identity movement, not to Chevie himself, and said they included discussions of Identity movement members growing their own food, fending for themselves, and creating mass chaos by killing police and judges. Tr. 1329-30. Neither Mr. Shultz nor Ms. Williams mentioned the APR in their testimony.

This was the bulk of the evidence offered by at trial to prove that Chevie Kehoe, prior to the Mueller murders, even entertained ideas about establishing an enterprise of his own to further white supremacist or separatist goals.

---

[8] Note that both of these were well-established organizations with significant numbers of followers and discrete sets of beliefs; although they were initially related, they have operated as entities unto themselves for decades. https://www.adl.org/education/resources/profiles/aryan-nations (last visited December 3, 2019). Christian Identity was started roughly 50 years ago. "Its adherents believe that white people of European descent are the descendants of the 'Lost Tribes' of ancient Israel." https://www.adl.org/resources/backgrounders/christian-identity (last visited December 3, 2019).

William Mueller was himself a member of/adherent to the Christian Identity movement. Tr. 2232-2233.

**A014**
Appellate Case: 19-3576     Page: 15     Date Filed: 12/04/2019 Entry ID: 4858509

### C. Post-trial Proceedings.

Mr. Lee's conviction and sentence were affirmed on direct appeal. *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004), *cert. denied*, 545 U.S. 1141 (2005). He filed a motion to vacate under 28 U.S.C. § 2255 on June 26, 2006, raising numerous grounds for relief. Doc. No. 1118-1. Among these was a general allegation that the Government had improperly withheld information favorable to the defense bearing on guilt or punishment in violation of its constitutional *Brady* obligations, *id.*at 7.[9] In its response, the Government did not directly address the *Brady* claim but simply noted that it had previously provided a "huge amount" of discovery to trial counsel. Doc. No. 1126-1 at 45 n.16. No new exculpatory evidence was released by the Government during these collateral proceedings.

### D. Findings Made on Direct Appeal in Mr. Lee's and Chevie Kehoe's Case.

Mr. Lee and Mr. Kehoe filed separate appeals but the existence of, and membership in, an enterprise were raised in both. In its opinion from Mr. Lee's appeal, the Eighth Circuit explained that an enterprise had to exhibit three essential features:

> Three elements must be proven to show that a RICO enterprise existed: (1) a common purpose that animates the individuals associated with it; (2) an ongoing organization with members who

---

[9] Mr. Lee's initial § 2255 counsel had no facts to support the allegation that the Government had suppressed any information, but sought to preserve the issue in the event that any information came to light that would support of a specific *Brady* claim. The district court denied the claim without a hearing.

12

function as a continuing unit; and (3) an ascertainable structure distinct from the conduct of a pattern of racketeering. *United States v. Kragness,* 830 F.2d 842, 855 (8th Cir. 1987).

*United States v. Lee,* 374 F.3d 637, 647 (8th Cir. 2004).

Mr. Kehoe, whose direct appeal was litigated first, challenged the sufficiency of the evidence that any RICO enterprise existed and, specifically, that the APR existed before or at the time any of the charged racketeering acts were committed. He also challenged the sufficiency of the evidence that the Mueller murders were committed in furtherance of the enterprise.

As to the existence of the enterprise in the first instance, the Court of Appeals for the Eighth Circuit said the Kehoes, Mr. Lee and Mr. Lovelace shared the common purpose of advancing the interests of the APR with the eventual goal of forming a country for members of Christian Identity. The evidence cited by the court in support of this was: 1) Gloria Kehoe's testimony that robbery victims, including the Friedmans, were targeted based on their race or ethnicity by Chevie and "other members of the APR," *United States v. Kehoe,* 310 F.3d 579, 586 (8th Cir. 20020; 2) Chevie and Mr. Lovelace used proceeds from the Friedman robbery, the second charged racketeering act which occurred in June, 1995, to buy property in Priest River, Idaho, where ultimately, a group would congregate or live; 3) Chevie and Mr. Lee exchanged letters after their arrests on which they

13

**A016**

included symbols associated with APR; and 4) Lee bore a tattoo with an APR symbol. *Id.*

The court also found that the three Kehoes, Mr. Lee, and Mr. Lovelace worked in concert to advance the APR's goals which included stockpiling munitions. According to the court, these five were "consistent companions and recurrent cohorts." *Id.* at 586.

The court also said that the group had structure because Chevie Kehoe founded and led the APR, and he possessed and controlled the majority of the proceeds from illegal activities and distributed the remainder of them to his cohorts. *Id.* at 587. The court said nothing further about the positions of the other four purported members of the enterprise.

The court also determined that there was sufficient evidence that the Mueller murder was committed to further the goals of the APR. The court noted that there had been evidence that the Muellers had a significant sum of money and ammunition, and that William Mueller was believed to be an FBI informant. According to the court, the Government's evidence was sufficient to show that Chevie and Mr. Lee took weapons and ammunition which they stockpiled or sold, and that the proceeds of the sales furthered the APR's activities. *Id.* at 587.

In his own direct appeal, Mr. Lee challenged *inter alia* the sufficiency of the evidence that he was a member of Mr. Kehoe's enterprise. The Court of Appeals

identified two sources of evidence it said adequately supported the jury's decision on that point:  the testimony of James and Delvine Wanker, who lived at and then managed the Shadows Motel in Spokane concurrent with Mr. Lee's residence there during the spring of 1996, that Mr. Lee had white supremacist beliefs "prior to his pretrial detention;"  and the testimony of Sean Haines, with whom Mr. Lee roomed from late summer, 1995 through April, 1996, which "demonstrated that Lee belonged to Kehoe's white supremacist movement and engaged in activities to further it." *Lee v. United States,* 374 F.3d 637, 647-48 (8th Cir. 2004).  Mr. Haines never testified to any period of time during which this occurred.  The Wankers did not meet Mr. Lee until the spring of 1996 so their testimony was relevant only to events that happened after the Mueller murders.

### E.    Facts and Law Underlying the Present Motion.

The evidence withheld by the Government deals a hard blow to the prosecution's proof of the existence of an enterprise and whether any such enterprise paid Mr. Lee to commit these murders. Mr. Lee addresses the relationships between the law and the newly-revealed facts below.

**A018**

Appellate Case: 19-3576     Page: 19     Date Filed: 12/04/2019 Entry ID: 4858509

### 1. Elements (In Addition to Proof of Commission of Violent Crime) Necessary to Prove VICAR Crimes.

Counts 3, 4, and 5 of the Indictment charged both Mr. Lee and Mr. Kehoe with VICAR crimes for which the predicate crime of violence was murder as defined by Arkansas state law.

18 U.S.C. § 1959(a) ("VICAR") states in relevant part:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders … in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished –

The Government contended at trial that Mr. Lee was guilty of VICAR crimes by virtue of having received something of pecuniary value from an enterprise engaged in racketeering activity as consideration for his participating in the murder of the Mueller family, while Chevie was guilty by virtue of having committed them to maintain his position in the enterprise:

Here's where it's a little different for each of the defendants. Chevie Kehoe, as the leader of the enterprise, is asked to do something that's expected of him. And as the leader of the enterprise, when it's time to commit murder, he has to act. Danny Lee got paid for his services. He received something of pecuniary gain, a thousand dollars and a shotgun for his services from this criminal enterprise.

Tr. 6823 (Government's closing argument). See also, Tr. 6990 ("[H]e helped murder the Muellers to get the money.")

16

**A019**

**2.** **"Enterprise" is Defined Differently for Purposes of RICO, with which Mr. Lee was also Charged, from its Meaning under VICAR: for RICO an Individual can Suffice; for VICAR, an Enterprise Requires a Group.**

Mr. Lee and Mr. Kehoe were charged at trial with both RICO and VICAR offenses. The lion's share of the prosecution's case focused on Mr. Kehoe, his white supremacist beliefs, and the criminal activities he (not Mr. Lee) was accused of committing.  Likewise, the jury instructions focused on the RICO crimes; instructions about how to apply the VICAR statute were left to the end and seemed much like an afterthought.

Both RICO and VICAR offenses require a finding of an enterprise.  But the definitions of "enterprise" in the statutes are notably different. Under RICO, 18 U.S.C. § 1961(4), a single individual can constitute an enterprise. Under VICAR, a single individual cannot.

The definition of an enterprise under VICAR, § 1959(b)(2), is "any partnership, corporation, association, or other legal entity, and any union or *group of individuals associated in fact although not a legal entity*, which is engaged in, or the activities of which affect, interstate or foreign commerce." (emphasis added). The only category of VICAR enterprise that fit the allegations in Mr. Lee's case was a group of individuals associated in fact.

In Mr. Lee's case, the only people identified in the Indictment as comprising the necessary "group of individuals, associated in fact" that entered into an

17

**A020**

Appellate Case: 19-3576     Page: 21     Date Filed: 12/04/2019 Entry ID: 4858509

agreement with Mr. Lee to commit the VICAR murders were Chevie Kehoe, Cheyne Kehoe, Kirby Kehoe, and Faron Lovelace. A single one of these men, by himself, could constitute an enterprise for purposes of the RICO crimes. No single individual, however, could constitute an enterprise for purposes of the VICAR crimes.

### 3. In Order to Be an Enterprise, this Group Had to Have a Structure or Share a Common Purpose.

The Supreme Court has defined the essential conditions under which a group of people can constitute an association-in-fact enterprise. It

> must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose. As we succinctly put it in *Turkette*, an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct." [*United States v. Turkette*,] 452 U.S. [576], at 583, 101 S.Ct. 2524 [1981].

*Boyle v. United States*, 556 U.S. 938, 946 (2009).

While such an association-in-fact need not have a hierarchical structure, it must be a "continuing unit that functions with a common purpose." *Id.* at 948. And, although decisions may be made by different methods, the Supreme Court only lists examples that contemplate decisions being made by the group, such as "majority vote, consensus, [and] show of strength." *Id.* Thus, even if "several individuals, independently and without coordination, engaged in a pattern of RICO

18

**A021**

predicate offenses . . . [p]roof of these patterns would not be enough to show that the individuals were members of the enterprise." *Id.* at 947, n. 4.

As will become clear, the previously withheld information provided to Mr. Lee by Cheyne and Kirby Kehoe, demonstrates that there was no continuity of function, commonality of goals, group decision-making, or any other structure among the five men purported to comprise the charged enterprise in this case.

### 4. The Previously Withheld Information.

Mr. Lee has attached to this Motion a declaration from Cheyne Kehoe, dated November 1, 2019, and a declaration from Kirby Kehoe, dated November 3, 2019. Cheyne Kehoe was a central witness for the prosecution at trial. Though Kirby was never called to testify, he had given multiple interviews to law enforcement and prosecutors and was deemed by the Government to be a substantial cooperator. Cheyne's and Kirby's declarations pierce the notion, promoted by the prosecution at trial, that an enterprise existed at the time of the Mueller murders. Their statements also demonstrate that no "enterprise" ever paid Mr. Lee to murder the Muellers. These were two fundamental tenets the Government had to prove to win convictions against Mr. Lee on the VICAR charges.

Cheyne and Kirby repeatedly and consistently made these points to law enforcement before trial but this evidence was never disclosed to the defense.

**A022**
Appellate Case: 19-3576     Page: 23     Date Filed: 12/04/2019 Entry ID: 4858509

Evidence from Cheyne and Kirby Kehoe that was previously undisclosed makes three critical points: 1) the APR existed only in Chevie's fantasies, and there was no enterprise; 2) they never condoned killing the Muellers and would never have authorized Chevie to pay Mr. Lee to kill them; 3) there was neither continuity nor any shared goals among the purported members of this enterprise.

First, both Cheyne and Kirby told law enforcement agents that there was no enterprise and the APR was nothing but a pipe dream of Chevie's. Kirby says:

> I had a meeting – one of many – with the prosecution prior to Chevie's trial. The prosecutors wanted me to testify to the structure and my involvement in an organization, "APR." I kept telling them there was no such organization or any other. I never did things as part of an organization or on an ongoing basis.

Exh. B, ¶ 15.[10] The crimes his son Chevie committed had no larger purpose. They were

> something to do in the moment for financial gain, not something planned out. I told them Chevie had fantasies to do this or that, but he committed crimes of opportunity to get money for himself, have cars and other things. Chevie committed crimes because he was too lazy to work. He was good at convincing other people to do work for him and then getting paid for what they did. . . .

---

[10] This is consistent with Faron Lovelace's own statements during his trial in Idaho for the capital murder of Jeremy Scott (a crime also alleged as a predicate act in this case). *See State v. Lovelace*, No. CRF-96-1506 at 447 (Dist. Ct. 1st Jud. Dist. Sept. 9, 1997) (Attached as Exh. F ("I'm facing a couple of lifes and thirty years, I believe, by the Federal government. I'm under investigation today for possible – the Rico[sic] investigation, which is organized crime. *I've told at least one investigator it's ridiculous*.") (emphasis added).

20

Chevie talked a lot and he was sort of trying to find himself and he wanted to do exciting things but he never actually acted as part of an organization or group.

Exh. B, ⁋15.

Cheyne makes the same point in his own declaration that he told law

enforcement agents:

As far as I could tell, any money Chevie ever got went straight into his own pocket for his own personal use. Chevie just liked to commit crimes for his own personal gain . . . .

APR was a pipe dream of Chevie's. In his mind only, he fantasized of creating his own area.  He liked to talk about it because it *was* a fantasy. But as I kept telling every law enforcement person I spoke to, Chevie committed his crimes so that he could just get things for himself. . . .

I can't stress enough, as I stressed during my interviews with the Government, that there was no "organization." Chevie committed his crimes for himself.

Exh. A, ⁋⁋ 16, 33, 34.[11]

---

[11] Tanna Hoecher, who married Cheyne in October, 1995, lends additional support to Kirby's and Cheyne's assertions. In her declaration, dated September, 2014, she observes,

 I know Chevie and his family were accused of committing crimes to finance a white supremacist organization.

 I never saw any evidence of that and don't believe it's true. The Kehoes lived in almost complete isolation and didn't seem to have any friends and didn't seem to be part of any organization.

 In addition, whatever money they got, by whatever means, was used for their own benefit. I lived in the same trailer with Chevie's family, for example, for months on end and, every time he got any money, he spent it on himself and his family. When he had any amount of

21

**A024**

Second, neither Cheyne nor Kirby knew Chevie had any plans to kill the Muellers, would not have condoned it if they had known, and never authorized Chevie to pay Mr. Lee to commit these crimes.

Cheyne explains in his declaration that he was living in rural eastern Washington from October, 1995, through the spring of 1996, and had little contact with his father or with Chevie. He knew nothing in advance about any plan Chevie had to kill the Muellers and would not have supported such a plan if he had known about it:

> . . . I would never have gone along with the idea of killing the Muellers and I would have done everything I could to discourage Chevie from doing it if I'd known he was planning it.

Exh. B, ¶ 32. Cheyne had never even met Mr. Lee until the spring of 1996. Id. at 21.

Kirby met Mr. Lee for the first time days before the Mueller murders purportedly occurred, and told Chevie to ditch him:

---

money, he spent it on things that seemed frivolous to me. But I saw no evidence that he was giving his money to any kind of organization or using it to promote any separatist type of organization or philosophy. The money lined his own pockets, no one else's. Chevie was all about Chevie.

Exh. E, ¶¶ 11-13.

22

**A025**

> I never trusted strangers and I didn't trust Lee. I told Chevie to not associate with him and leave him alone. He wasn't family, I didn't know him, I didn't approve of Chevie being with him.

> I did not want Chevie traveling with Lee or telling Lee anything about any members of our family or working with him in any way. I have never approved of including people from outside our family in any kind of business, and I particularly did not trust Chevie's ability to judge people.. . .

> I made all of this clear to the people who interviewed me in Montana and in subsequent interviews.

Exh. B, ℙℙ 10, 11 and 12.

Third, the relationships among the members of the "group" were neither consistent or continuous, nor did they share any structure or common goals.

In his declaration, Cheyne describes the fact that Chevie discarded Mr. Lovelace "like a dog alongside a side of a road" during the summer of 1995. Exh. A, ℙ 14. He himself thought Mr. Lovelace was "weird," untrustworthy, and mentally unstable. Exh. A, ℙ 9. He also notes that he rejected the "hateful" beliefs and values of the Christian Identity movement Exh. A, ℙ 7. Nor did Cheyne support any other white supremacy beliefs, including the Aryan Nation and Chevie's own white supremacist beliefs; he told federal agents he would never have committed crimes in furtherance of such beliefs. Exh. A, ℙ 29.

Similarly, according to Kirby's declaration, when federal agents asked him whether he or his sons were associated with a group, he told the agents that:

23

> none of us were part of any group. My kids were never part of any organization. When Cheyne was a teenager, he visited Elohim City with his family for a while which was a Christian Identity community, but he left there after a few weeks and never went back.

Exh. B, ¶ 14.

> Cheyne summed the situation up best when he said,

> None of the rest of us had any relationship with each other, except that I was Chevie's brother and Kirby was my dad. Danny wasn't some member of any organization with us; neither was Faron. They were both people Chevie could manipulate because they had nothing else and nowhere else to go.

Exh. A, ¶ 34.

## III. CLAIM FOR RELIEF

The previously undisclosed evidence contained in these two declarations gives rise to a claim for relief for a violation of *Brady v. Maryland* and its progeny.

### A. Mr. Lee's convictions for the VICAR crimes were obtained in violation of *Brady v. Maryland.*

According to the Supreme Court, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999). In the context of a *Brady* violation, prejudice means that the suppressed evidence was "material." *Id.*

24

Appellate Case: 19-3576     Page: 28     Date Filed: 12/04/2019 Entry ID: 4858509

**1. The previously undisclosed evidence was exculpatory.**

The new evidence Kirby and Cheyne Kehoe have provided in their declarations strikes at the heart of the prosecution's case for these VICAR crimes. Proof of the VICAR elements required the Government to produce evidence that Mr. Lee agreed to commit acts of murder in exchange for something of pecuniary value received from an enterprise (not from Chevie Kehoe acting in his personal capacity), and that an enterprise existed at the time of the Mueller murders. Any evidence that undercut either of these elements must, therefore, be deemed exculpatory.

**a. In order to establish the alleged VICAR crimes, the Government was required to prove that an enterprise existed at the time of the VICAR crimes, and entered into an agreement with Mr. Lee to commit these specific murders.**

For the Government to convict Mr. Lee of the VICAR crimes, each of the following factual predicates had to be proved:

First, the APR had to have existed at the time of the commission of the VICAR crimes, or else there would not be an enterprise with which Mr. Lee could enter into an agreement.

Second, the APR must have been engaged in racketeering activities by or at the time of the charged VICAR crime because the statute requires not only that the

25

**A028**

defendant receive something from an enterprise, but that it be an enterprise "engaged" in racketeering activity.

Third, because the statute requires that the defendant received something of pecuniary value "as consideration" for committing specific crimes of violence, Mr. Lee must have had the specific intent to commit not just any crime, such as robbery, in exchange for something of pecuniary value, but the specific murders he was alleged to have committed.

Fourth, the agreement into which Mr. Lee allegedly entered must have been with the enterprise itself, or a person acting on behalf of the enterprise, not merely with Chevie Kehoe acting in his personal capacity. *See United States v. Rolett*, 151 F.3d 787, 790 (8th Cir. 1998) ("In order to prove its case against appellant, the Government had to prove that there was an enterprise engaged in racketeering activity and that *the enterprise* gave or promised consideration to appellant and Davidson to commit a murder, or to conspire to commit a murder.") (emphasis added). [12]

---

[12] *See also United States v. Andino*, 101 F. Supp. 2d 171, 175 (S.D.N.Y. 2000) (emphasis added):

> To convict a defendant under the "murder for hire" provision of § 1959(a), the Government must prove that the defendant was paid or promised payment for attempting or conspiring to commit murder. The Government must also prove that the payment or promise of payment was received from an enterprise engaged in racketeering activity. In this case, the Government is required to prove that Andino received payment or a promise of payment from SMM [the alleged

26

**A029**

In turn, because these were VICAR offenses, the enterprise had to consist of a group of individuals, linked together by three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

> **b. The previously undisclosed evidence establishes that there was no "group of individuals" associated-in-fact, with a common structure or goal at the time of the Mueller murders, and is, therefore, exculpatory.**

According to the Indictment, there were five people accused of constituting the alleged VICAR enterprise: Mr. Lee; Chevie Kehoe, Cheyne Kehoe, Kirby Kehoe and Faron Lovelace.[13] Of them, only Cheyne testified at trial, though Kirby and Faron had spoken with prosecutors and law enforcement agents on a number of occasions.

---

enterprise]. The Government presented its case on the theory that Andino expected to be paid, and was paid, by John Castro. It was thus necessary for the Government to prove that John Castro acted on behalf of SMM when he gave money to Andino. Put differently, in order for the payment to have been received from the enterprise, Castro must have been acting as an agent of the enterprise, not in his personal capacity, when he made the payment to Andino.

[13] Mr. Lovelace had never met Mr. Lee at the time of the Mueller murders; they first met while incarcerated together in Arkansas, prior to trial. No suggestion was ever made at trial that Mr. Lovelace was in contact with Chevie Kehoe from the summer of 1995 going forward. Nor is (or was) there any evidence to suggest that Mr. Lovelace had any contact with Cheyne or Kirby Kehoe during this period of time.

27

Appellate Case: 19-3576     Page: 31     Date Filed: 12/04/2019 Entry ID: 4858509

Cheyne Kehoe explains in his declaration that he did not meet Mr. Lee until the spring of 1996, several months after the date on which the Muellers were purportedly killed. Cheyne knew Faron Lovelace and considered him "weird," "crazy" and mentally unstable, someone he neither liked nor trusted. Cheyne had no contact with him after June, 1995. Declaration of Cheyne Kehoe, ¶¶ 9, 13, 14 and 15.

Cheyne got married on October 1, 1995, immediately moved in with his wife's family in a remote area of eastern Washington state, and had little contact with any of his own family for the next year, including Kirby and Chevie. He recalls only two occasions on which he saw Chevie from October, 1995, through summer of 1996. These meetings occurred after January 11, 1996 – once in late January or early February, 1996, and once in April or May, 1996. Declaration of Cheyne Kehoe, ¶¶ 17 through 21. It was on this latter occasion that Cheyne first met Mr. Lee.

Kirby Kehoe confirms in his declaration that he had had little to no contact with Cheyne during the months leading up to the Mueller murders. Kirby also noted that Chevie showed up unexpectedly at Kirby's temporary home in Arizona in early January, 1996, and spent a day with his parents. Mr. Lee was with Chevie. Kirby had never met Mr. Lee before this time. Declaration of Kirby Kehoe, ¶¶ 5 through 8. Kirby had not had contact with Mr. Lovelace since June, 1995.

28

Appellate Case: 19-3576   Page: 32   Date Filed: 12/04/2019 Entry ID: 4858509

This, then, was not a "group of individuals" that had any actual continuity of association or purpose in the months leading up to the Mueller murders.

As noted in subsection II. E. 4, *supra,* neither Cheyne nor Kirby shared Chevie's goals. Cheyne did not share the values of any white supremacy groups, nor did he adopt Chevie's own brand of white supremacy or separatism. Both he and Kirby make clear in their declarations that no organization of any sort existed between or among them.

All of this evidence was exculpatory; it would have derailed the Government's proof that a "group of individuals associated in fact" existed at the time the Mueller murders occurred or that any such group shared a common structure or goal.

    c. **The previously undisclosed evidence establishes that, even assuming Chevie Kehoe agreed to pay Mr. Lee to commit the Mueller murders, he did so in his personal capacity, not as an agent for an enterprise.**

To establish the VICAR crimes, the Government had to show that Chevie Kehoe was acting not on his own but as an agent of the enterprise, if and when he paid Mr. Lee. Neither Cheyne nor Kirby knew Chevie had plans to kill the Muellers, and would not have supported such a plan, had they known. Had he known, Cheyne would have "done everything" he could have to discourage Chevie from such a course. Id., ¶ 32.

**A032**

Appellate Case: 19-3576    Page: 33    Date Filed: 12/04/2019 Entry ID: 4858509

Kirby said that he explicitly told Chevie to disassociate himself from Mr. Lee. Kirby wanted Chevie to have nothing to do with him and, even though he did not know what Chevie's plans were, he expressed adamantly that he did not want Mr. Lee mixed up in any family business. Under the circumstances, no reasonable factfinder would have believed Kirby had authorized Chevie to pay Mr. Lee to commit these offenses. See Exh. B, ¶¶ 10 and 11.

Both Cheyne's and Kirby's statements demonstrate that, even if an enterprise existed, no enterprise agreed to pay Mr. Lee to kill the Muellers; any such agreement was with Chevie Kehoe acting alone.

Thus, this evidence, too, was exculpatory.

## 2. The evidence was suppressed by the Government.

The Government provided documents in pre-trial discovery reflecting four interviews and statements ("statements") from Kirby Kehoe, dated: March 1, 1997; April 29, 1997, the transcript of an interview by Lincoln County Sheriff's Department; August 20, 1997; and a September 2, 1997, transcript of an appearance in federal court. The Government provided documents in discovery reflecting twelve interviews and statements from Cheyne Kehoe, dated: June 16, 1997, FBI 302 of arrest and interview; June 21, 1997; July 5, 1997, with the FBI; July 8, 1997; August 14, 1997, Grand Jury Testimony; August 21, 1997; September 15, 1997, an interview by the Stevens County Sheriff's Department; a

**A033**

Appellate Case: 19-3576    Page: 34    Date Filed: 12/04/2019 Entry ID: 4858509

report from ATF agent Jose Wall on information provided on August 12, 1997; March 15, 1998, Dateline Interview; an April 21, 1998, interview by the Spokane FBI; an April 21, 1998, interview by Cincinnati FBI; and July 7, 1998, Grand Jury Testimony.

None of these statements reflects the exculpatory evidence noted above. Yet Cheyne said that he provided all of this information to law enforcement agents and prosecutors. Exh. A, ¶ 28 ("Also, I was interviewed by a lot of law enforcement people, both police and prosecutors, before Chevie's trial and I explained to them that I had never had any discussion with Chevie or anyone else about killing the Mueller family before it happened. I knew nothing about it.") Id., ¶ 32 (". . . I told the agents repeatedly I would never have gone along with the idea of killing the Muellers and I would have done everything I could to discourage Chevie from doing it if I'd known he was planning it."); Id., ¶ 33 ("[A]s I kept telling every law enforcement person I spoke to, Chevie committed his crimes so that he could just get things for himself.") Id., ¶ 34 ("[T]he Government misrepresented my words about events having to do with connections between Danny, my dad, Chevie, me, and the APR. I can't stress enough, as I stressed during my interviews with the Government, that there was no 'organization.'")

Kirby likewise has informed prosecutors and law enforcement agents of this exculpatory evidence. Exh. B, ¶ 3 ("I was interviewed by federal agents on a

31

**A034**

Appellate Case: 19-3576     Page: 35     Date Filed: 12/04/2019 Entry ID: 4858509

number of occasions." During one meeting, in Troy, Montana, in 1997, "the agents wanted to discuss my sons' activities" and Kirby he told them he had had little contact with Cheyne in the fall of 1996 and that he was not keeping in touch with Chevie, either, during this period.); ¶¶ 10 through 12 ("I made [the fact that I told Chevie to not associate with Mr. Lee and leave him alone, and did not want Chevie traveling with Lee] clear to the people who interviewed me in Montana and in subsequent interviews.").

Perhaps most tellingly, Kirby recounts that, at a meeting prior to Chevie's trial, prosecutors specifically told him they

> wanted me to testify to the structure and my involvement in an organization, "APR." I kept telling them there was no such organization or any other.

Id. ¶ 15.

Prosecutors were able to avoid the damaging effect Kirby's testimony would have had by not calling him to testify and not providing his exculpatory information to the defense. And prosecutors went one step further. They argued to the jury that Kirby had ultimately decided to plead guilty to Count 1 of the Indictment, which involved an acknowledgement that an enterprise existed, even after having hamstrung the defense by *not* providing them with the exculpatory accounts Kirby had made to them.

32

**A035**

Appellate Case: 19-3576    Page: 36    Date Filed: 12/04/2019 Entry ID: 4858509

But the Government had given Kirby a deal that ensured his continued silence about these matters. Even though Kirby did not testify at Mr. Lee's trial, at Kirby's own sentencing hearing, the Government nevertheless moved for a sentencing guidelines departure under 5K1.1 "in that Kirby Kehoe did provide substantial assistance to the Government in the prosecution of his son Chevie Kehoe and of Danny Lee," (Kirby Kehoe Sentencing Hearing Tr. at 12). The Government went even a step further and requested that Kirby's sentence be run *concurrently* with a sentence he was already serving for an unrelated conviction. This last request prompted indignation from the trial court, which declined the Government's request, announcing that Kirby "is the substantial beneficiary of the entire prosecutorial process," and that the sentence the court was imposing of 44 ½ months was so minimal, it saw no reason to run the sentences concurrently. Id. at p. 40.

By withholding from the defense Cheyne's exculpatory statements, the Government ensured that defense counsel would not probe these areas on cross-examination.

Cheyne, like Kirby, got a very good deal from the Government. As a purported member of Mr. Kehoe's racketeering enterprise, Cheyne was exposed to federal charges that carried a potential life sentence. As part of his cooperation agreement, he received a grant of immunity and escaped liability for *any* of the

**A036**

Appellate Case: 19-3576    Page: 37    Date Filed: 12/04/2019 Entry ID: 4858509

charged activities of the enterprise. He was never indicted federally for these crimes. And in his state trial in Ohio on charges of attempted murder of two state troopers during his shootout to escape arrest, Paula Casey, one of the federal prosecutors in Mr. Lee's case, actually testified to the jury about Cheyne's cooperation. At Cheyne's Ohio sentencing, federal prosecutors recommended leniency for his cooperation. As a result, his sentence for shooting his way out of a traffic stop with police officers was reduced by half from 24 years to just 11.[14]

Both Cheyne and Kirby were also placed in witness protection.

### 3. Withholding this exculpatory evidence prejudiced Mr. Lee.

The Government's proof of the necessary components of VICAR offenses could not have withstood the challenge posed by information from Cheyne and Kirby that they did not know about these murders in advance, would not have condoned these murders had they known about them in advance, or that Kirby had

---

[14]Cheyne was originally sentenced to 24 years and 5 months in his Ohio case. Tr. 5283. His agreement with federal prosecutors included notifying the Ohio authorities about his cooperation. Tr. 5281. In December 2000, a year after Mr. Lee was sentenced to death, Cheyne's sentence was reduced to 11 years. *White supremacists arrests conjure memories of Kehoe shooting rampage*, Dayton Daily News, Oct. 16, 2013, https://www.daytondailynews.com/news/crime--law/white-supremacists-arrest-conjure-memories-kehoe-shooting-rampage/gGMyTxJv1Dz5s7El3ExwlK/ (last visited Nov. 25, 2019).

specifically instructed Chevie to disassociate himself from Mr. Lee. Nor could the VICAR charges have withstood averments from Cheyne and Kirby that no enterprise existed – that Chevie committed crimes simply to line his own pockets, that his were crimes of opportunity, and that Chevie's talk of building an Aryan homeland was nothing more than talk and fantasy – and a fantasy they did not share.

This evidence would have directly undermined the notion that the APR actually existed, much less that the Kehoes, Mr. Lee and Mr. Lovelace shared the common purpose of advancing its interests. *United States v. Kehoe, supra* at 586. It would have directly contradicted any suggestion that Chevie, Cheyne, Kirby, Mr. Lovelace and Mr. Lee were "consistent companions." *Id.* at 587. It would have given the lie to the idea that Chevie committed crimes to promote his white supremacy beliefs.

"[F]avorable evidence is material, and constitutional error results from its suppression by the Government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A showing of materiality "does not require demonstration by a preponderance that the disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." *Kyles*, 514 U.S. at

35

**A038**

434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* (quotations omitted). In addition, "it is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Id.* at 435.

The prosecution of Mr. Lee for the Mueller murders under Arkansas state law would have been straightforward.[15] Not so, this prosecution under the VICAR statute.

---

[15] Capital murder, Ark. Code §5-10-101, includes the following: "(a) A person commits capital murder if: (1) Acting alone or with one or more other persons (A) The person commits or attempts to commit: . . .(v) Robbery, 5-12-102; (vi) Aggravated robbery, 5-12-103; (vii) Residential burglary; . . . and (B) In the course of and in furtherance of the felony . . . the person or an accomplice causes the death of a person under circumstances manifesting extreme indifference to the value of human life; . . . or (3) With the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person; . . .

Capital murder is punishable by death or life imprisonment without parole. Ark. Code § 5-10-101.

First degree murder requires proof that the person committed or attempted to commit any felony, and caused the death of a person under circumstances manifesting extreme indifference to human life or with the purpose of causing the

**A039**

Appellate Case: 19-3576     Page: 40     Date Filed: 12/04/2019 Entry ID: 4858509

There was the problem that there was no solid evidence of the existence of the APR before spring of 1996. The insignia, the letters, Chevie's explanations of his plans to Cheyne and various cellmates all came months or years after January, 1996.

There was the problem that the existence of any enterprise based on the Indictment's racketeering acts rested on shaky grounds. Just how shaky those grounds were was proved by the number of crimes the jury acquitted on. Chevie was accused of having killed Jeremy Scott in August, 1995, to further the ends of his enterprise – but the jury found Chevie not guilty. Chevie was accused by the Government of having killed Jon Cox, purportedly recruited to be a member of the APR in the spring of 1996 – but the jury found him not guilty. Chevie and Mr. Lee were both accused of having bombed the Spokane City Hall in the spring of 1996, to further the "enterprise's" anti-government agenda – but the jury found both of them not guilty. Mr. Lee himself was not accused of any other racketeering act not connected with the Mueller offenses.

The prosecutors had to simply insist, with little affirmative proof to support it, that the APR

> had a formal organization. That means it had a continuity of
> personnel: Faron Lovelace, Danny Lee. Danny Lee came and went to

---

death of another person, caused the death of another person. Ark. Code 5-10-102 (a)(1) or (2).

**A040**

Appellate Case: 19-3576     Page: 41     Date Filed: 12/04/2019 Entry ID: 4858509

> some degree . . . Cheyne Kehoe was brought on board. But through it all there was Chevie Kehoe, the man in charge, the man who set the pace and set the operations for this enterprise.

Tr. 6824-25. This bold statement, the centerpiece of the Government's closing argument on this point, could not have held up had the defense known what Cheyne and Kirby had told the prosecutors: There was no organization; there was no structure; there were no shared goals or beliefs; there was no agreement among the members of this group. There was only Chevie Kehoe who, with help from others, committed crimes of opportunity, to line his own pockets and suit his own purposes.

Had the defense been armed with this exculpatory evidence, Mr. Lee's counsel could have raised successful pre-trial challenges to the Government's federal case.

At trial, the case the jury heard would have been markedly different. The jury would have learned how little contact the so-called members of the "enterprise" had with each other and that neither Mr. Lovelace nor Cheyne had even met Mr. Lee until long after the Muellers were killed. Jurors would have heard that Chevie committed his crimes for his own personal gain, and that neither Cheyne nor Kirby committed crimes with the goal of funding or arming any kind of movement nor were involved in any sort of enterprise with Chevie. Given this evidence there is reasonable probability that they jury would have found the

38

**A041**

Government did not prove the necessary elements of an enterprise at any point, and certainly not before spring of 1996.

The jury would also have learned that Cheyne would have discouraged Chevie from killing the Muellers, had he known of his plans, and did not support his white supremacist beliefs, and Kirby had explicitly urged Chevie to disassociate from Mr. Lee. In light of this new evidence, there is a reasonable probability that the jury would not have found the necessary element of pecuniary gain and thus not convicted on the VICAR counts.

With this evidence, the already weak VICAR case against Mr. Lee would have been cut off at the knees.

This Court should vacate his convictions on Counts 3, 4 and 5, and the sentences imposed thereon.

## IV. CONCLUSION

Prosecutors must scrupulously observe the obligations imposed on them by the Constitution, nowhere more so than before the Government seeks to end the life of the defendant. Here, the Government disregarded its responsibilities, depriving Mr. Lee of a fair trial with a reliable outcome and of an acquittal on the charges of the VICAR murders. This Court, after hearing evidence, should vacate Mr. Lee's VICAR murder convictions and his death sentences, and order a new trial on these charges.

**A042**

Appellate Case: 19-3576     Page: 43     Date Filed: 12/04/2019 Entry ID: 4858509

# PRAYER FOR RELIEF

WHEREFORE, Movant Daniel Lee respectfully requests that this

Court provide the following relief:

1. Permit Movant to utilize the processes of discovery set forth in Federal Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his Motion;

2. Require Respondent to file an Answer to the Motion in the form prescribed by Rule 5 of the Rules Governing Section 2255 Proceedings in the United States District Courts, identifying all proceedings conducted in Movant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3. Permit Movant to file a Reply to the Respondent's Answer, responding to any affirmative defenses raised by the Answer;

4. Conduct an evidentiary hearing to resolve any factual disputes raised by the Respondent's Answer to this Motion, or by Movant's Reply to any affirmative defenses raised by the Respondent. Because Movant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

5. Permit Movant to file a Memorandum of Law in Support of this Motion in accordance with a briefing schedule established by this Court;

6. Permit oral argument as appropriate and required;

7. Vacate Movant's convictions on Counts 3, 4, and 5, and order that a retrial be conducted; and

40

**A043**

Appellate Case: 19-3576    Page: 44    Date Filed: 12/04/2019 Entry ID: 4858509

8.  Grant such further and additional relief as may be just and proper.

Respectfully submitted this 4th day of December, 2019.

/s/ *Amy Gershenfeld Donnella*
AMY GERSHENFELD DONNELLA
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 641-6103
Amy_Donnella@fd.org

/s/ *George G. Kouros*
GEORGE G. KOUROS
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
(301) 821-0855
George_Kouros@fd.org

Counsel for Daniel Lewis Lee

**A044**
Appellate Case: 19-3576    Page: 45    Date Filed: 12/04/2019 Entry ID: 4858509

**CERTIFICATION PURSUANT TO RULE 2(b)(5)**
**OF THE RULES GOVERNING SECTION 2255 PROCEEDINGS**

The undersigned, being authorized to sign for the movant, declares under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on: December __, 2019

/s/ *George G. Kouros*
GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

Appellate Case: 19-3576     Page: 46     Date Filed: 12/04/2019 Entry ID: 4858509

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Eastern District of Arkansas using the CM/ECF system on December __, 2019. This motion was served via this court's CM/ECF electronic case filing system and by email upon:

JOHN M. PELLETTIERI
Attorney, U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Ave., N.W., Rm. 1264
Washington, D.C. 20530
(202) 307-3766
john.pellettieri@usdoj.gov

MICHAEL GORDON
Chief, Criminal Division
U. S. Attorney's Office
Eastern District of Arkansas
Post Office Box 1229
Little Rock, AR 72203-1229
(501) 340-2600
michael.gordon@usdoj.gov

/s/ *George G. Kouros*
GEORGE G. KOUROS
Bar # 420813 (CT)
Attorney for Daniel Lee
Assistant Federal Public Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Telephone: (301) 821-0855
Email: George_Kouros@fd.org

**A046**

Appellate Case: 19-3576     Page: 47     Date Filed: 12/04/2019 Entry ID: 4858509

# DANIEL LEWIS LEE v. UNITED STATES
## INDEX OF EXHIBITS

Exhibit A:   Declaration of Cheyne Kehoe

Exhibit B:   Declaration of Kirby Kehoe

Exhibit C:   Sentencing Hearing Transcript, *United States v. Kirby Kehoe,*
No. CR 13-8223-PCT-GMS (D. Ariz. June 23, 2014)

Exhibit D:   Sentencing Hearing Transcript Excerpt, *United States v. Kirby Kehoe,*
No. 97-CR-243 (E.D. Ark. Aug. 24, 1999)

Exhibit E:   Declaration of Tanna Hoecher

Exhibit F    Transcript Excerpt, *State of Idaho v. Faron E. Lovelace*,
No. CRF 96-1506 (1st Jud. Dist. Ida., Sep. 8, 1997)

Exhibit G:   Verdict Form, *United States v. Daniel Lee & Chevie Kehoe*,
No. 97-CR-243 (E.D. Ark. May 4, 1999)

# EXHIBIT A

**A048**
Appellate Case: 19-3576     Page: 49     Date Filed: 12/04/2019 Entry ID: 4858509

## Declaration of Cheyne Kehoe

1.  My name is Cheyne Kehoe. I am the second eldest son of Gloria and Kirby Kehoe and younger brother of Chevie Kehoe. I was born on May 29, 1976.

2.  My family moved from Colville, Washington, to a rural area outside Harrison, Arkansas, in 1993. I was 16 or 17 years old at that time.

3.  My brother Chevie didn't move to Arkansas with our family. Chevie was already married to his first wife, Karena.

4.  Chevie hadn't lived with us much even before we moved. He had moved out when he was in high school and lived with one of his teachers. He and our father had a difficult relationship.

5.  I got a job, working at a sawmill in Arkansas. During the summer, I was working 12 and 14 hour days. I lived next to the sawmill, not with my family, so I wouldn't have to spend time traveling to and from work.

6.  Once the season was over at the sawmill, I moved to a community called Elohim City which was located on the Arkansas-Oklahoma border. The people who lived there were members of the Christian Identity movement. That was in the late fall of 1994.

1

**A049**

Appellate Case: 19-3576    Page: 50    Date Filed: 12/04/2019 Entry ID: 4858509

7. I was only 16 or 17 when I moved to Elohim City and I feel like I was really misled about their beliefs. I didn't believe in all the white supremacy stuff they talked about. They expressed really hateful beliefs and, once I realized what they were, I didn't share them.

8. After I had been at Elohim City for a couple of months, my brother Chevie came through. This was some time in January or February, 1995. Chevie had a trailer at the time, which he told me he had bought from a guy in Arkansas. Chevie stayed for 2 or 3 days and I had dinner with him one night but otherwise didn't spend much time with him. Chevie had his wife, Karena, with him and their two children.

9. During that visit, Chevie met a guy who was staying at Elohim City named Faron Lovelace. Faron was really weird and not in a good way. I didn't like or trust him at all. I was surprised that when Chevie left Elohim City, Faron left with him. Faron was not mentally stable. He did not connect with reality.

10. In late spring or early summer, 1995, my dad came through Elohim City and asked if I wanted to go back west with the family. I was ready to leave so I left with my dad.

11. When we got back to Spokane, my parents and younger brothers and I initially moved into the Shadows motel. We then moved to Colville, Washington.

2

*CK*

**A050**

Appellate Case: 19-3576     Page: 51     Date Filed: 12/04/2019 Entry ID: 4858509

12. Sometime in June, 1995, when we were still living at the Shadows motel, Chevie came by. *was Living there at that time/CK* While he was there, he got a phone call, and then asked me if I wanted to drive with him to Idaho. He told me he had to drop Faron Lovelace off there. He didn't tell me anything more than that. I agreed to go with him.

13. Faron joined us and when we stopped for groceries showed us a bag he had full of money. I had no idea at the time where it had come from. I still didn't like or trust Faron. I thought he was crazy and stayed away from him as much as I could. We left Faron in Idaho and drove back to Washington. Chevie had no use for Faron any longer. Chevie manipulated Faron to be a laborer in Idaho because he didn't want to do any work himself. He was always looking for a shortcut and having Faron work on the land was one of those shortcuts. This had nothing to do with any kind of white supremacy activity.

14. I didn't learn where Faron's money had come from until at least a year or so later when Chevie told me Faron *They/CK* had robbed someone. My father never mentioned a word to me about it, either. Eventually, Chevie dumped Faron like a dog in the road because Chevie didn't need him. *anymore/CK* *along side/CK*

15. I was never involved in any planning of that robbery, I had no idea what any of them were up to, this wasn't a group plan in any way. It seemed to me

3

*CK*

**A051**
Appellate Case: 19-3576    Page: 52    Date Filed: 12/04/2019 Entry ID: 4858509

Faron had his own motivations, like that he needed fast money and this robbery would get him some. Chevie manipulated Faron by holding his money for him. Then Chevie had control of it and would spend it all on himself and ~~dole~~ out small amounts.

doled /CK

16. As far as I could tell, any money Chevie ever got went straight into his own pocket for his own personal use. Chevie just liked to commit crimes for his own personal gain, and sometimes he could get Faron to do things because Faron had nowhere else to go.

17. I met my wife, Tanna, in July or August, 1995. We got married on October 1, 1995, about six weeks after we met. I was 19 years old. Tanna was 18, the oldest of a bunch of sisters. We moved in with Tanna's family – her parents and grandparents -- and continued to live with Tanna's family for about a year. We had our first child on July 23, 1996.

18. During the year I spent with Tanna's family, I had very little contact with Chevie. I saw him only a couple of times. The first time was during the summer or fall of 1995, before we got married. I took Tanna to the Shadows motel to meet my family. Chevie was there.

19. Tanna and I stayed at the Shadows for three or four days but after the first two days, Chevie and I got into a fight, and we parted on bad terms.

4

CK

20.     It's possible Chevie might have stopped by where we were staying for a few minutes here or there, but the next time I saw Chevie to have any conversation was late January or February, 1996, at a pizza place.  At that time, Chevie showed me a roll of gold coins he had.  I had no idea where he got the coins and he didn't talk to me about it until much much later.

21.     I didn't see Chevie again until the spring of 1996. That was the first time I met Danny Lee. Tanna was noticeably pregnant with our son at the time. At trial, I misspoke and said this happened in spring of 1995, but that was definitely wrong.  I was still living in Arkansas in the spring of '95, and hadn't even met Tanna yet.

22.     After our son Christopher was born, Tanna, the baby and I joined Chevie and his family, traveling with them to the southwest, the east, and eventually through Ohio. Chevie and I exchanged gunfire with some Ohio state troopers when we were out by ourselves, coming back from a gun show. Our wives and children were waiting for us, back at a campground.

23.     I made my way back to Tanna and Karena, we packed up the camper, and we drove out of there to Wyoming. Chevie met back up with us, too, in Wyoming.  We got some help from my dad when the camper collapsed.

5

**A053**

Appellate Case: 19-3576     Page: 54     Date Filed: 12/04/2019 Entry ID: 4858509

24.     Tanna, the baby and I headed out again with Chevie, Karena and their kids.  We were nearly out of money, we were trying to escape the cold weather, and we were pretty much out of food.  We drove south, first to Las Vegas, then to Arizona, and eventually we wound up in Utah, where we camped on land owned by the Bureau of Land Management.

25.     Things were pretty bad.  We were given some food and jobs by a man named Mr. Levitt we met down there who had a nearby alfalfa farm.  Chevie kept getting more and more abusive to Karena and to me.  Tanna and I wanted to leave but Chevie had the car keys and controlled all the money Mr. Levitt paid us.

26.     One night, Chevie beat me up pretty badly and Tanna and I decided we needed to leave.  About that time, Mr. Levitt gave me some money of my own and Tanna and I took the baby and made a break for it.  We headed back up north, and she and I decided I needed to turn myself in to law enforcement for the sake of my family.

27.     I testified at Chevie's trial about a lot of the things I've said above but the way the prosecution jumped around, the timeline of events was probably pretty jumbled-sounding.

28.     Also, I was interviewed by a lot of law enforcement people, both police and prosecutors, before Chevie's trial and I explained to them that I had

6

A054

never had any discussion with Chevie or anyone else about killing the Mueller family before it happened. I knew nothing about it.

29. I never shared Chevie's beliefs and I had no idea until I was traveling with Chevie in the trailer that he had committed any crimes. I told the agents that. I also told them I never would have taken part in those crimes and didn't share the beliefs of the Christian Identity or the Aryan Nation or any other white supremacy group. I knew about them, I heard talk about them, but that wasn't my belief system. I would never have committed crimes to support those beliefs.

30. I also didn't believe in polygamy. I had no interest in populating the country with Aryan babies. I never had a second wife the way Chevie did. I told the agents that, too.

31. I didn't believe in killing police, either. I felt trapped when Chevie and I got stopped by the police in Ohio, and I panicked. What I did was wrong but it wasn't part of a bigger plot to kill police. I just wanted to get back to Tanna and Christopher. I told the police that, too.

32. Most important, I told the agents repeatedly I would never have gone along with the idea of killing the Muellers and I would have done everything I could to discourage Chevie from doing it if I'd known he was planning it.

7

A055
Appellate Case: 19-3576    Page: 56    Date Filed: 12/04/2019 Entry ID: 4858509

33. APR was a pipe dream of Chevie's. In his mind only, he fantasized of creating his own area. He liked to talk about it because it *was* a fantasy. But, as I kept telling every law enforcement person I spoke to, Chevie committed his crimes so that he could just get things for himself.

34. ~~I really~~ Felt I/CK had no choice but to testify at Chevie's trial. The government ~~threatened~~ Informed/CK me that I'd be indicted along with Chevie, ~~Danny and my dad~~ if I didn't cooperate. But the government ~~completely twisted~~ misrepresented/CK my words about ~~everything~~ Events/CK having to do with connections between Danny, my dad, Chevie, me, and the APR. I can't stress enough, as I stressed during my interviews with the government, that there was no "organization." Chevie committed his crimes for himself. None of the rest of us had any relationship with each other, except that I was Chevie's brother and Kirby was my dad. Danny wasn't some member of any organization with us; neither was Faron. They were both people Chevie could manipulate because they had nothing else and nowhere else to go.

35. Prior to Chevie's trial, agents asked me several times about my mother's (Gloria's) stability. I ~~told~~ advised/CK them my mom ~~is and always was seriously~~ was unstable/CK ~~mentally ill~~. That's always been pretty obvious to me and the people who know her. As I told the agents, my mom has always been paranoid and she sees and hears things that aren't there, so much so that my dad took her for psychiatric treatment when they lived in North Carolina.

8

A056
Appellate Case: 19-3576    Page: 57    Date Filed: 12/04/2019 Entry ID: 4858509

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 11/1/19

_____
Cheyne Kehoe

9

**A057**
Appellate Case: 19-3576     Page: 58     Date Filed: 12/04/2019 Entry ID: 4858509

# EXHIBIT B

**A058**
Appellate Case: 19-3576    Page: 59    Date Filed: 12/04/2019 Entry ID: 4858509

# Declaration for Kirby Kehoe

1. My name is Kirby Keith Kehoe. I am currently incarcerated at FCI Lompoc. I am 71 years old and have had a chronic form of cancer for many years.

2. I am Chevie Kehoe's father. I am also Cheyne Kehoe's father. I no longer have any relationship with either of those sons and I haven't in many years.

3. I was interviewed by federal agents on a number of occasions. One meeting was in Troy, Montana, in 1997 and at that meeting the agents wanted to discuss my sons' activities.

4. I told them that my wife Gloria, Cheyne, the younger boys and I used to live in Arkansas as a family and at one time our family was friends with the Muellers. Gloria, Cheyne, and I had been over to their house for dinner.

5. I also told them that I lived in Arizona in a trailer park from the fall of 1995 until late January or early February, 1996. I was living with my wife Gloria *Kehoe* and several of our younger sons.

6. Cheyne was not living with us at the time. He had gotten married in October and was living in rural eastern Washington with his wife, Tanna, and

1

A059

Appellate Case: 19-3576    Page: 60    Date Filed: 12/04/2019 Entry ID: 4858509

Tanna's family. I met Tanna a few weeks before she and Cheyne got married, but otherwise had little contact with Cheyne at that time. Once I moved to Arizona, I had had no contact with him at all until I moved back to the Northwest in late January or early February, 1996.

7. Chevie wasn't living with us in Arizona, either. I think he was living in Spokane, Washington, most of the time we were in Arizona, but I wasn't keeping in touch with him.

8. In early January, 1996, Chevie unexpectedly showed up at our trailer park in Arizona. He was with another young man I had never met before.

9. I later learned that Chevie's travel companion was Daniel Lee but I didn't even know Lee's name at the time. Chevie referred to him as "D-Man." *KK*

10. I never trusted strangers and I didn't trust Lee. I told Chevie to ~~ditch~~ *not associate* *with* him. He wasn't family, I didn't know him, I didn't approve of Chevie being with *and leave him alone* him.

11. I did not want Chevie traveling with Lee or telling Lee anything about any members of our family or working with him in any way. I have never approved of including people from outside the family in any kind of business, and I particularly did not trust Chevie's ability to judge people.

2

*KK*

A060

Appellate Case: 19-3576      Page: 61      Date Filed: 12/04/2019 Entry ID: 4858509

12. I made all of this clear to the people who interviewed me in Montana and in subsequent interviews.

13. The agents in Troy wanted to discuss the Ohio shootout and whether I had seen my sons. They also asked if I knew if they were involved in an organization named Aryan Nations in Northern Idaho. They wanted to know if I had heard of it and whether I or my sons were associated with them or with any other group.

14. I told them none of us were part of any group. My kids were never (KK) part of any organization. When Cheyne *a teenager* was about 17, he ~~lived~~ *visited* at Elohim City *with his family* for a while which was a Christian Identity community, but he left there after a few (KK) *weeks* ~~months~~ and never went back. Chevie talked a lot and he was sort of trying to find himself and he wanted to do exciting things but he never actually acted as part of any organization or group.

15. I had a meeting – one of many – with the prosecution prior to Chevie's trial. The prosecutors wanted me to testify to the structure and my involvement in an organization, "APR." I kept telling them there was no such organization or any other. I never did things as part of an organized group or on *numerous times* (KK) any kind of ongoing basis I told them (as I had before) that Chevie was a kid who was wild, acting on a lark, that his crimes were something to do in the moment, (KK) *for financial gain*

3

*KK*

A061

not something planned out. I told them that Chevie had fantasies to do this or that, but he committed crimes of opportunity to get money for himself, have cars and other things. Chevie committed crimes because he was too lazy to work. He was good at convincing people to do work for him and then getting paid for what they did.

16. The prosecutors were extremely angry and frustrated (KK) that I wouldn't testify that we were part of an organization or that Chevie operated in or with a group or "enterprise."

17. Gloria and I had been together since she was 17 years old and she had some struggles in life. She sometimes had panic attacks and sometimes she had what she called dreams where she saw things happening to us, like seeing people (sometimes government agents) assaulting her. I did what I could to help and care for Gloria but it was difficult sometimes because of her mental illness. I told agents all of this prior to Chevie's trial, too.

18. When I pleaded guilty in 1999, I agreed to things in my plea agreement that were not true. The government prosecutors threatened to give me 30 years in prison if I did not agree in my plea that an enterprise existed, and to plead guilty to the racketeering.

KK

4

A062

Appellate Case: 19-3576    Page: 63    Date Filed: 12/04/2019 Entry ID: 4858509

19.     My attorney told me that I had to do the plea admitting that APR was real even if it wasn't because it was the only way to get my sentence reduced.  I felt trapped because I didn't want to spend the rest of my life in prison.  I was up in years, 50 already, and ill with my chronic cancer condition.  I gave the government the plea and factual agreement they wanted.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed on: *11, 3, 2019*

_Kirby K. Kehoe_     11/3/2019
Kirby Keith Kehoe

5

A063

Appellate Case: 19-3576     Page: 64     Date Filed: 12/04/2019 Entry ID: 4858509

# EXHIBIT C

**A064**

Appellate Case: 19-3576     Page: 65     Date Filed: 12/04/2019 Entry ID: 4858509

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA


United States of America,                )
                                         )
                Plaintiff,               ) No. CR 13-8223-PCT-GMS
                                         )
                vs.                      ) Phoenix, Arizona
                                         ) June 23, 2014
Kirby Keith Kehoe,                       ) 11:52 a.m.
                                         )
                Defendant.               )
                                         )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE G. MURRAY SNOW

(Sentencing Hearing)

Appearances:

For the Plaintiff:        Lacy Cooper
                          Assistant United States Attorney
                          UNITED STATES ATTORNEY'S OFFICE
                          Two Renaissance Square
                          40 North Central, Suite 1200
                          Phoenix, Arizona  85004-4408
                          (602) 514-7500

For the Defendant:        Deborah L. Williams
                          Assistant Federal Public Defender
                          FEDERAL PUBLIC DEFENDER'S OFFICE
                          850 W. Adams Street
                          Suite 201
                          Phoenix, Arizona  85007
                          (602) 382-2700

Court Reporter:           Gary Moll
                          401 W. Washington Street, SPC #38
                          Phoenix, Arizona  85003
                          (602) 322-7263

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

**A065**

P R O C E E D I N G S

THE CLERK:  This is CR 13-8223, United States of America versus Kirby Keith Kehoe, on for sentencing.

MS. COOPER:  Good morning again, Your Honor.  Lacy Cooper for the United States, along with Agent Rustin Wayas from ATF.

THE COURT:  Good morning.

MS. WILLIAMS:  Good morning, Your Honor.  Deborah Williams on behalf of and with Kirby Kehoe.

And, Your Honor, I do apologize for my lateness. Hopefully, the Court's aware I had a sentencing that went significantly over.

THE COURT:  I was made aware of that, but I appreciate it, anyway, Ms. Williams.

MS. WILLIAMS:  Your Honor, given that my client is in a wheelchair, would the Court mind if we stay at counsel table?

THE COURT:  I would not, but I would ask that both you and he speak as close as you can to the microphone while you're there.

MS. WILLIAMS:  Absolutely.

THE COURT:  All right.

Mr. Kehoe, good morning, sir.

THE DEFENDANT:  Good morning.

THE COURT:  You're here because you have entered a

**A066**

plea agreement with the United States, and in that plea agreement you agreed to plead guilty to Count 4, which is felon in possession, in violation of several federal statutes.

Can you hear me all right, sir?

THE DEFENDANT:  Yes.

THE COURT:  All right.  In exchange for your plea of guilt, the United States agreed to recommend that you receive a downward adjustment in your criminal offense level to reflect your acceptance of responsibility for the crime.

They further agreed to recommend the low end of the federal sentencing guideline range -- oh, I'm sorry.  I am reading the wrong plea agreement.  I apologize.

Let me start that over.  The United States -- you agreed with the United States to plead guilty to Count 1, which is felon in possession, not Count 4, in violation of federal statutes.

In exchange for your plea of guilt to that count, the United States did agree that you would receive a downward adjustment in your criminal offense level to demonstrate your acceptance of responsibility.

They further stipulated with you under 11(c)(1)(C) that your sentence would not exceed 10 years, and your plea agreement would be contingent upon the successful plea of your co-defendant, which is your son, Cheyne Christopher Kehoe, who was just sentenced here.

11:53:48

11:54:07

11:54:37

11:54:50

11:55:07

You had no agreements with the government as to whether the firearms were used in another felony pursuant to 2K2.1(b)(6)(B), but the U.S. did agree that it would dismiss Counts 2, 3, 6, and 7.

You further agreed that you would waive any defenses, any appeal rights, any rights to collaterally attack the sentence, and you agreed to forfeit the firearms and ammunition that were listed on page 5 and 6 of your plea agreement.

Are those the essential terms of your plea agreement with the United States as you understand them, sir?

THE DEFENDANT:  Correct.

THE COURT:  Ms. Williams, have I left anything out?

MS. WILLIAMS:  No, Your Honor.

THE COURT:  Ms. Cooper, have I left anything out that should be stated on the record?

MS. COOPER:  No, Your Honor, but I will point out to the Court there's one error in the plea agreement in the factual basis, and that is that of the 13 firearms that the defendant admitted to possessing, only 12 of those had previously traveled in interstate and foreign commerce.

I spoke with Ms. Williams about that ahead of time.  I don't think it changes any of the circumstances of sentencing today but I wanted to point it out to the Court.

THE COURT:  All right.  Which paragraph needs to be adjusted?

**A068**
Appellate Case: 19-3576     Page: 69     Date Filed: 12/04/2019 Entry ID: 4858509

MS. COOPER:  Judge, it would be on page 9 of the plea agreement.

MS. WILLIAMS:  I'm sorry, Judge.  I can't hear counsel.

THE COURT:  Do you want a headset?

MS. WILLIAMS:  I would love a headset.

(Pause in proceedings while Ms. Williams and the defendant are provided assisted hearing audio headsets.)

MS. WILLIAMS:  Thank you.

THE DEFENDANT:  Thank you.

THE COURT:  Do you mind repeating what you last said, Ms. Cooper?

MS. COOPER:  Of course, Your Honor.  I was pointing out that there was an error in the factual basis of the plea agreement on page 9, which is the first paragraph of the factual basis.  It refers to 13 firearms which were found in the defendant's trailer, and it says that all of these firearms had previously been shipped or transported in interstate or foreign commerce.  That's an error.  Only 12 of them had traveled in interstate commerce.

THE COURT:  All right.  So we'll make that factual correction unless you object to it, Ms. Williams.

MS. WILLIAMS:  I do not.

THE COURT:  It does not otherwise impact the federal sentencing guideline recommendation, I don't believe.

MS. WILLIAMS:  I would agree with that.

THE COURT:  Mr. Kehoe, you appeared -- you know, I don't -- let's see.  You did change your plea to one of guilt, and when you did that and the plea was accepted the United States Probation Department began and prepared a presentence investigation report in your case.

What that report does is it tells me what you did to commit the crime that you pled guilty to.  And it further calculates what it believes to be your criminal -- what Probation believes to be the appropriate criminal offense level in your case; it tells me about your past convictions and your past sentences and the length of those sentences; tells me about your family life, your physical, mental, and emotional health; tells me about your education, your economic circumstances, and other matters pertaining to sentencing.

When a draft of the report was completed it was given to Ms. Williams, your counsel, so that she could review it with you.  She is familiar with the sentencing guidelines and the law pertaining to sentencing but, of course, does not have the familiarity with the facts of your life that you do, and so she's instructed to review that report with you in its entirety.

Ms. Williams, did you review the report with Mr. Kehoe in its entirety?

MS. WILLIAMS:  Yes, Judge.

**A070**

THE COURT:  All right.  Now, she did file, Mr. Kehoe, an objection on your behalf.  Before we get and take up the matters that are in that objection, Ms. Cooper, does the united -- I did not receive any objections to the presentence investigation report from the United States.

Do you have any?

MS. COOPER:  I do not, Your Honor.

THE COURT:  All right.  As I understand it, Ms. Williams, you have raised two basic objections in your report -- in your objection.  If I miss any, please let me know.  You object to paragraph 24 in which the defendant is -- or Probation proposes a 4-point enhancement because it finds that -- well, it recommends that I find the defendant possessed firearms in connection with another felony, which is the marijuana grow he had on the property at the same time.

You object to that.  You also object to -- well, you do point out that he -- and I think Probation already made this correction -- that your client used medical marijuana from 2010 to today's date, instead of the initial dates contained in the first draft presentence investigation report.

You also object to your client's character- -- characterization as being a member of the Aryan People's Republic.

Have I stated correctly all the objections or substantive objections that you have to the report?

Appellate Case: 19-3576    Page: 72    Date Filed: 12/04/2019 Entry ID: 4858509

MS. WILLIAMS:  Yes.

THE COURT:  All right.  I have read the voluminous paperwork and exhibits submitted both by you and the government in connection with your objections, but I'll hear anything else that you want to say.

MS. WILLIAMS:  Your Honor, I will not belabor all of -- belabor the documents that have been filed.  I would, however, point the Court to Exhibit 15 submitted by the government in the midst of a number of photographs that were received.

This gives the Court, I think, a slightly better view of the actual distance not in feet, but the distance one has to move from the trailer, which is off the left side of the picture, to the grow area, which is -- appears to be up a slight incline.  There's a road on the right side of the picture that seems to go up to the grow area.

The Conex Box D, which sits in the middle of the picture and is across the road from the trailer, I believe has been characterized in the pleadings and in the discovery as a locked Conex box, a box that was kept locked -- excuse me -- most, if not all, of the time.

The Court must look at, of course, whether the weapons had any -- had an actual role in another felony or potential emboldening --

THE DEFENDANT:  Just a minute.

12:01:04

12:01:24

12:01:49

12:02:14

12:02:45

Appellate Case: 19-3576     Page: 73     Date Filed: 12/04/2019  Entry ID: 4858509

MS. WILLIAMS:  -- role.  Excuse me.

(Off-the-record discussion between Ms. Williams and the defendant.)

MS. WILLIAMS:  And while I suppose, Judge, that one could always argue that any gun had some potential of emboldening or contributing to any other offense that may be going on in the -- in the general location, I believe there needs to be more than that for the government to establish by a preponderance and for the Court to find that there is a connection between the guns and the marijuana.

It's been discussed in the pleadings that it is our position, and I believe the discovery and the evidence supports the fact that these -- that the guns are an offense unto themselves.  They existed independently from whatever else was going on and for whatever purpose the marijuana was being grown, whether it was for distribution or whether it was for personal use.

Other than that, Judge, I will stand on my pleadings.

THE COURT:  Let me ask, I'm looking at Exhibit 15 now.

MS. WILLIAMS:  Yes.

THE COURT:  And I do see the -- I don't know what it is, but I assume it's a roadway, coming down with a different elevation by Conex Box D in the grow areas designated, and I can see the, I don't know, looks like camouflage or sun screening, and the weapons were not just found in Conex

Box D, were they?

MS. WILLIAMS:  That's correct.

THE COURT:  They were found, distributed in the other -- throughout the remaining properties, including other Conex boxes in the defendant's residence.

MS. WILLIAMS:  I think that's a fair comment, yes, with the exception of the grow area.  And again, as has been discussed, this is a very remote area.

THE COURT:  Let me ask another thing that -- that I read with some care.  Your client did plead guilty to Count 1 in Eastern Arkansas, and it is true that the plea agreement that you provided for me -- and I thank you -- says that he is not to be -- the murders that his co-defendants are going to be considered in conjunction with the sentencing of his codefendants are not to be considered in his sentence.

But it never in the plea agreement seeks to withdraw from the specification in Count 1 that your client was in fact a member of the Aryan Republic, does it?

MS. WILLIAMS:  It doesn't withdraw that, Your Honor, but nor does that -- nor does the plea agreement or anything else -- well, let me start over.

It has long been my position, Judge, that when one pleads guilty to an offense, even if it is a conspiracy offense, that does not per se embrace each and every allegation made by the government.  One doesn't plead guilt- -- one pleads

**A074**

guilty to specific offenses, and if a -- if relevant conduct, for example, is going to be embraced, it is done so in a factual basis, or in other statements made by a defendant, for example, at sentencing.  That did not occur here, and Mr. Kehoe has vigorously objected to this characterization each time he has been in court.

12:07:00

THE COURT:  All right.  Ms. Cooper.

MS. COOPER:  Your Honor, the application note for this particular sentencing enhancement says that when the guns are being possessed in connection specifically with a drug trafficking activity, that the close proximity to the drugs, drug paraphernalia, drug manufacturing materials to the firearms, is indicative of those firearms being possessed in connection with the drug trafficking offense.

12:07:19

The defendant in this case, he possessed guns in his trailer.  Now, he possessed a lot of guns on the property, Your Honor, but the guns that the government are alleging were possessed in connection with the drug trafficking offense are the ones -- specifically the loaded firearms that were found in his trailer, which is referred to in the photos as Trailer E.

12:07:37

12:07:53

Trailer E is approximately 20 feet from where some of the marijuana grow drying was -- drying plant materials were found.  It's approximately 70 feet from the actual grow area, which is where the Court pointed out that there's camouflage netting over.

12:08:15

**A075**
Appellate Case: 19-3576    Page: 76    Date Filed: 12/04/2019 Entry ID: 4858509

It is in a very close proximity.  The 924(c) cases which are analogous to this sentencing enhancement that the Court should look to say that the Court really should consider the proximity of the guns, the accessibility of the guns, and the strategic location of the guns.

In this case, the guns were very close to the marijuana grow.  They were very accessible to the defendant. The six guns were loaded.  One shotgun right by the front door had a round in the chamber ready to be used at any moment, and they're strategically located in different places around his trailer so that he can grab a gun at any moment in case there was an intruder on his property or law enforcement on his property, and they're strategically located where -- he spends most of his time in his trailer, Your Honor, so that's where he's going to keep his guns to protect his marijuana grow.

We also know that when he leaves his trailer, on at least one occasion he took a gun with him, he took his Glock with him, because he pointed it at his son when his son came on the property unannounced.  So they are strategically located for someone who is growing marijuana on their property.

It's very similar to the facts in Thongsy, where the defendant was keeping a firearm with him in his sleeping quarters, his tent, that was immediately next to a marijuana grow operation on a remote -- remote location.

Judge, with respect to the pictures, I'd just point

the Court to Exhibit 14, which shows the defendant's trailer, Trailer E, and the 20 feet to Conex Box D-South. And for clarification, Your Honor, Conex Box D-South did not have any firearms in it. That Conex box is not what they call the bunker, where the other locked -- locked-up firearms were located. Conex Box D-South had marijuana hanging on a makeshift hanging rack for drying purposes so that it could be sold.

There's another Conex box immediately to the top of that picture that is shown in other photos, Your Honor.

The other Conex Box D, Conex Box D-North, also did not have firearms in it. It had additional marijuana plants hanging on makeshift racks for drying.

The pictures that the government has provided to the Court are not of the bunker, because the government's not arguing that any of the weapons in the bunker are possessed in connection with the drug trafficking. The pictures that the government provided are pictures of the large grow area, the area where the marijuana was actually being grown, and the area where it was being processed and hung to dry so that it would be -- it could be sold. There weren't just the makeshift racks; there were also bags of marijuana that had already been taken off of the plant and put into large Ziploc bags so that they could be sold.

The picture, Exhibit 13, sort of shows a good overhead

A077
Appellate Case: 19-3576    Page: 78    Date Filed: 12/04/2019 Entry ID: 4858509

shot of the defendant's trailer and this grow area that includes both Conex Box D-North and Conex Box D-South, as well as the area where the marijuana was being grown.

Your Honor, the six loaded firearms in defendant's trailer are in very close proximity to the marijuana grow operation as a whole.  They're strategically placed in his trailer so that he can grab them and use them at any time that he needs to.  And when he leaves his trailer he carries a firearm with him so that he's armed.

THE COURT:  All right.  I am going to overrule both objections.  I do find, pursuant to Thongsy, that at least some of the weapons were possessed in sufficient proximity to the grow, which was being done for commercial purposes, to embolden the defendant in that activity.

I further find that there -- that the specification that the defendant in the past has been affiliated with the Aryan Republic is also supported by the evidence.

And that means that I do accept the presentence investigation report and its findings and determinations, which would recommend a guideline range that exceeds the statutory maximum, which is 120 months, and thus the 120-month period becomes the recommended sentence.

Ms. Williams.

MS. WILLIAMS:  Your Honor, I also raised in my pleadings, and this is not an objection, but a request that

Appellate Case: 19-3576    Page: 79    Date Filed: 12/04/2019 Entry ID: 4858509

Mr. Kehoe's medical records be attached -- be included with the presentence report to go to the Bureau of Prisons, and I wanted to make sure to raise that today.

Mr. Kehoe has some very significant medical issues that will bear directly on his placement, his programming needs, and his treatment needs, and we are requesting that the Court make a judicial recommendation for placement in a BOP medical facility, and I believe specifically Rochester has the equipment and facilities to deal with cancer and similar issues.

I will tell the Court that his -- my client's physical condition has deteriorated immensely since he's been at CCA: his mobility, his back issues; a whole host of issues.  So he is certainly going into BOP in worse condition than he came in when he was arrested, and I think these are very significant issues that are likely to only get worse.

Your Honor, the Court has ruled on the objections. Mr. Kehoe continues to dispute the characterization of his membership in organizations, whether existing or being -- whether existing or planned.  He certainly has a lot of -- he has his own beliefs, and he lives a lifestyle which is outside what one might call the norm in this country, although at this point in time, some of his beliefs are certain- -- are certainly more widely shared than they have been in the past. This is not a time when people in this country are big fans of

the government, shall we say.  It's not a happy time in our country.

He is a man who wants to be left alone, who chooses to live in a very remote area of Arizona, and regardless of the fact that he is a felon in -- a felon, he lives in an area where he believes it is necessary to arm himself for protection and in accordance with his fears and concerns to deal with what he believes will be at some point the collapse of our country as we know it.

I think when you step back and look at this case for what it is, which is a felon in possession case, 10 years is an awful lot of time.  It is not justified by his criminal history, and despite the adjustments, I just think it is an -- it's just more time than is appropriate to the charge and to the facts of this case.  So under 3553, I would ask the Court to consider a sentence below 10 years.

I have nothing further.  Thank you.

THE COURT:  Mr. Kehoe, do you have anything you'd like to say, sir?

THE DEFENDANT:  It would -- it would take too much time.

THE COURT:  Well, sir, I'm willing to listen.

THE DEFENDANT:  Well, there's just too many suppositions and -- and lies involved here.  I'm -- I'm not what -- this whole procedure from the last time I was arrested,

**A080**

and all the labels that were put on me at that time are -- are not substantiated by witnesses or my behavior.  I never was a member of any of those organizations.

I've never been a member of any of those organizations or even -- I despise them.  They caused my son's downfall.  They are the ones that were involved in there after they got out from under the household's control and things exploded and I tried to help him through there, and that's the reason I'm contaminated with this stuff is because I love my sons and I was only trying to help them decide and help them do what was necessary for me to protect them as a father.  And I got labeled with all these things and it is totally -- it's a lie.

I'm not these things.  People that know me personally, a half a dozen I could bring that will tell you that I am not this person they're portraying here, period.  And I have not got justice the last time and I'm not getting justice this time, either.  This is -- this is -- this is -- it's just -- it -- I can't even think the words to place it in context.

I just can't believe this can happen in this country, that things can be thrown labels and people lie and make comments about me and they're taken as fact and put on the record and then I'm having to do this time.  It's -- it's totally wrong.  There's no justice in this at all, only procedure.

THE COURT:  Thank you, sir.

12:17:45

12:18:04

12:18:24

12:18:42

12:18:59

Appellate Case: 19-3576     Page: 82     Date Filed: 12/04/2019 Entry ID: 4858509

Ms. Cooper.

MS. COOPER:  Judge, considering the 3553(a) factors, the government does believe that a sentence of 10 years is appropriate in this case.  Looking at the nature and circumstances of this particular offense, it's not as though the defendant just possessed one firearm to protect him from wildlife out on his property, or something like that; he was acquiring multiple assault rifles.  It was a veritable arsenal that he had on his property.  The amount of ammunition alone was too many to count, Your Honor.  We had to approximate how many rounds, based on the weight of the ammunition.  The defendant had gas masks.  He had bullet-proof vests.  The circumstances of this particular offense and the possession of firearms is serious.

Looking at the history and characteristics of this particular defendant, obviously he has two prior crimes of violence.  He has -- despite what he says today, Your Honor, I think the record supports that he does have a tendency toward -- he has White supremacist views and antigovernment views, and that's included in his prior RICO conviction where he was convicted of being a part of a particular enterprise, that being the Aryan People's Republic.  It was not a specific organized group, but it was a fledgling.  He was trying to get it to be a new White supremacist group that was recognized.

He has a propensity for violence.  His son said

that -- that he would put his views into action when the time was right.  That would include if he was in ill health and he believed that he had nothing to lose, that he would take violent action against the government using his firearms specifically against judges and law enforcement.

One of his sons said he hinted at things of violence and that he claimed that he didn't is have much time to live, and that he didn't like the government.  And the prior agent who worked on his earlier cases said that he was involved -- he was a White supremacist, had antigovernment extremist views, and that was why he was involved in the earlier activities, including the RICO case.

Looking at the deterrence for this particular defendant, he has previously served a sentence of 95 and a half months, and that didn't deter him from getting out of prison and immediately starting to acquire firearms again even though his -- one of his previous convictions was acquiring firearms that he shouldn't have.

One of the previous counts was that he possessed improvised grenades, and in this case he had black powder for making explosives, Your Honor.  He's continuing down the same path that he was before.  The greatest concern for the government is the need to protect the public from this defendant.  Even though he appears today as a frail man, when he was out of custody he was carrying marijuana up this sloped

roadway and walking around fine on his property.  I know he's elderly, he's getting on in age.  I'm sure that by the time he gets out of custody he's going to be even frailer than he is today.

But Your Honor, when he is out of custody he is violent.  And the fact that he's ill makes him even more violent, according to his sons.  In particular for law enforcement, Your Honor, I think that there is a huge concern that this defendant will try either himself or try to influence other people to take out violent action on law enforcement based on all the evidence that the Court has in front of it, and the government does believe that a sentence of 10 years is appropriate.

THE COURT:  Mr. Kehoe, there is a sentencing statute that I follow when I sentence anybody.  It requires that I consider the nature and circumstances of the offense that I'm sentencing them for and the history and characteristics of the offender.  And after I've considered those things, then I have to impose a sentence that is sufficient, but not greater than necessary, to serve a number of different factors.

It has to reflect the seriousness of the offense.  In your case, I suspect that -- or I tend to agree with your counsel, Ms. Williams, that certainly a large part of your motivation is your view about the government, your view about lots of other things, but I also have found, and I do find,

that you did use the firearms.  They emboldened you in growing marijuana, which is also illegal, and selling it.  And that, in light of the fact that you're a prohibited possessor and have had very long previous sentences, I think does require a significant prison sentence in this case.

12:24:01

The other factors I have to consider are promoting respect for the law, providing a just punishment.  I have to deter you, and not only you, but others, from engaging in this kind of conduct, and I have to take steps to protect the public from further crimes that you might commit.

12:24:22

I don't necessarily -- I mean, I think it's appropriate to put down on here that in the past that you've been associated with the Aryan Republic.  That does not mean that imposing your sentence, I necessarily believe that you continue to, or ever necessarily did, hold such views.

12:24:39

But unfortunately, I don't need to consider that at all to determine that you -- and I don't consider it at all to determine that you do need to serve a long prison sentence in this case to protect the public from further crimes that you might commit, just in light of your criminal record and the

12:24:58

large extent of firearms that you did have when you were a prohibited possessor.  I have to consider how I sentence other people who are similarly situated.  And after having considered all those things, I do believe that the guideline sentence is the appropriate one in your case.

12:25:17

**A085**
Appellate Case: 19-3576    Page: 86    Date Filed: 12/04/2019 Entry ID: 4858509

I will append to your presentence investigation report your medical records to be sure that you receive -- and I will direct the Bureau of Prisons, instruct the Bureau of Prisons to appropriately evaluate you so that you can receive appropriate medical care and treatment in an appropriate facility.

12:25:34

But pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that Kirby Keith Kehoe is hereby committed to the Bureau of Prisons for 120 months.

The defendant shall pay a special assessment of $100, which shall be due immediately.  The Court finds that the defendant does not have the ability to pay and orders that the fine be waived.

12:25:51

The defendant then shall pay a total of $100 in criminal monetary penalties, due immediately.

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:  The balance is due in equal monthly installments of $25 over a period of four months, to commence 60 days after release from imprisonment.

12:26:02

During incarceration, payment of criminal monetary penalties is due at a rate of not less than $25 per quarter, and payments shall be made through the Bureau of Prisons Inmate Financial Responsibility Program.

12:26:17

Criminal monetary payments shall be made to the Clerk of the United States District Court, Attention: Finance, Suite

12:26:32

Appellate Case: 19-3576     Page: 87     Date Filed: 12/04/2019 Entry ID: 4858509

130, 401 West Washington Street, SPC 1, Phoenix, Arizona 85003-2118.

Payments should be credited to the various monetary penalties imposed by the Court in the priority established under 18, United States Code, Section 3612(c).

The Court hereby waives the imposition of interest and penalties on any unpaid balance.

Upon your release from imprisonment, you shall be placed on supervised release for three years.  And while on supervised release you shall comply with the standard conditions of supervision adopted by this Court in General Order 12-13.

Of particular importance:  You shall not commit another federal, state, or local crime during the term of supervision.

The mandatory drug testing provision is suspended, and within 72 hours of your release from the custody of the Bureau of Prisons you shall report in person to the probation office in the district to which you are released.

The defendant shall comply with the following additional conditions:  You shall submit your person, property, house, residence, vehicle, papers, computers, as defined in 18, United States Code, Section 1030(e)(1), other electronic communications or data storage devices or media or office, to a search conducted by a probation officer.  Failure to submit to

a search may be grounds for revocation of release.  You shall warn any other occupants that the premises may be subject to searches pursuant to this condition.

The defendant's interest in the following property shall be forfeited to the United States: one Ithaca, Model: 37, 12 gauge shotgun, serial number 371157249; one Ruger Model: 10/22, 22 caliber long range caliber rifle, serial number 231-02701; one Glock, Model: 21, .45 auto -- automatic caliber pistol, serial number GHT827; one Zastava, Model: M70AB2, 7.62x39mm rifle, serial number 707737; one Rossi, Model: Matched Pair, .410 bore/.22 caliber -- .22 long range caliber shotgun/rifle, serial number SR122418; one Mossberg, Model: 500A, 12 gauge shotgun, serial number 933009; one Marlin, Model: 336, 30-30 caliber rifle, serial number 24079093; one Charter Arms, Model: AR-7 Explorer, .22 caliber long range caliber rifle, serial number A239714; one Norinco, Model: NHM90, 7.62x39mm rifle, serial number MSOl7996; one Glock, Model: 17, 9x19 caliber pistol, serial number PS145US; one Del-Ton, Inc., Model: DTI-15, 5.56mm rifle, serial number J05009; one JLD Enterprises, Model: PTR 91, .308 WIN caliber rifle, serial number A6741; one Kel-Tec, Model: Sub-2000, 9mm rifle, serial number E7L73; one Mossberg, Model: 500, 12 gauge shotgun, serial number T559568; one Polytechnologies, Model: M-14S, .308 WIN caliber rifle, serial number 10613; one DPMS, Model: LR-308, .308 WIN caliber rifle, serial number 94884; one

12:27:57

12:29:45

**A088**
Appellate Case: 19-3576     Page: 89     Date Filed: 12/04/2019 Entry ID: 4858509

AZ Armory, Model: AA15, receiver with stock, serial number 150443; over 15,000 rounds of assorted ammunition, to wit, 223 caliber, 5.56mm, .308 WIN caliber, 7.62x39 caliber, 9mm, .22 long range caliber, 12 gauge, .45 ACP caliber, .410 BORE caliber, and 30-30 caliber ammunition; 50 rounds of .22 long range ammunition; one American Body Armor (ABA), Model: K-15, ballistic vest, serial number 3122; one Second Chance, Model: ZYL IIA, ballistic vest, serial number 6000574; one Point Blank ballistic vest with no serial number; one one-pound container of Bullseye smokeless powder; two one-pound containers of IMR smokeless powder; and two one-pound containers of Pyrodex powder.

Do you understand the sentence as I've imposed it upon you, sir?

THE DEFENDANT:  This is not justice.  This is the reason people in the United States cannot tolerate the government any longer because there is no justice in this. These people that sit over here and lie, and you'll follow up on lies from the previous case.  This is just totally absurd. This is just no justice, period.

THE COURT:  I take it that that means you do understand the sentence but you don't agree with it, is that correct?

THE DEFENDANT:  Excuse me?

THE COURT:  I take it that that means you do

12:31:47

12:32:02

12:32:13

**A089**

understand the sentence; you just think it's unjust, is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Ms. Williams, I do believe that I have accepted the defendant's plea agreement and sentenced him in compliance with it.  Does the defense object to that finding?                12:32:37

MS. WILLIAMS:  No, Your Honor.

THE COURT:  Does the prosecution object to that finding?

MS. COOPER:  No, Your Honor.                12:32:53

THE COURT:  All right.  Mr. Kehoe, the effect of my finding that I've sentenced you in compliance with your plea agreement is that you've waived your right to appeal.

If I have erred in making that finding and you have for some reason maintained your rights to appeal, then you                12:33:17 would have also maintained your rights to apply for leave to appeal in forma pauperis.  And were you to do that, the clerk of the court would prepare and file a notice of appeal on your behalf.  But with very few exceptions, any such notice must be filed within 14 days of today's judgment.                12:33:33

Do you understand that as well, sir?

THE DEFENDANT:  Yes.

THE COURT:  I wish you the best of luck.

Anything else, Ms. Williams?

MS. WILLIAMS:  Your Honor, with respect to the                12:33:45

Appellate Case: 19-3576   Page: 91   Date Filed: 12/04/2019 Entry ID: 4858509

requested recommendation for Rochester?

THE COURT:  I'm not going to recommend a specific facility but I will recommend, as I've already done, that the defendant's medical records be evaluated and that he be placed in an appropriate medical facility where he can receive appropriate medical care.

12:34:01

THE DEFENDANT:  I don't know how you people live with yourselves.

MS. WILLIAMS:  Wait.  Wait.  Wait.  We're not done.

THE DEFENDANT:  I just don't understand.

12:34:11

THE COURT:  Anything else, Ms. Williams?

MS. WILLIAMS:  Not from me, Your Honor.

THE COURT:  Ms. Kehoe, which counts?  We have count -- not -- Ms. Cooper, we have Counts --

MS. COOPER:  2, 3, 6 --

12:34:24

THE COURT:  -- 2, 3, 6, and 7?

MS. COOPER:  -- and 7, Your Honor, the government would move to dismiss.

THE COURT:  Counts 2, 3, 6, and 7 are dismissed.

MS. WILLIAMS:  Thank you, Your Honor.

12:34:30

THE COURT:  Thank you.

THE DEFENDANT:  The hell with all of you tyrants.

(Proceedings concluded at 12:34 p.m.)

C E R T I F I C A T E

I, GARY MOLL, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 2nd day of August, 2016.

s/Gary Moll

Appellate Case: 19-3576     Page: 93     Date Filed: 12/04/2019 Entry ID: 4858509

# EXHIBIT D

**A093**

Appellate Case: 19-3576     Page: 94     Date Filed: 12/04/2019 Entry ID: 4858509

H-2853 → (3919853)
(4339519)
H-1382

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
SEP 15 1999
JAMES W. McCORMACK, CLERK
By: _____ DEP CLERK

UNITED STATES OF AMERICA,

           Plaintiff,

  vs.                  No. LR-CR-97-243(4)

KIRBY KEITH KEHOE,        Tuesday, August 24, 1999
                        Little Rock, Arkansas
                        1:15 p.m.
           Defendant

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE G. THOMAS EISELE,
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:
On Behalf of the Plaintiff:
    MS. PAULA CASEY, United States Attorney
    MR. DAN STRIPLING, Assistant United States Attorney
       United States Attorney's Office
       TCBY Building
       425 West Capitol Avenue, Suite 500
       Post Office Box 1229
       Little Rock, Arkansas  72203-1229

On Behalf of the Defendant:
    MR. MADISON P. AYDELOTT, III, Attorney at Law
       Aydelott & Hannah
       115 West Arch
       Searcy, Arkansas  72143

Defendant Present

  Proceedings reported by machine stenography.  Transcript prepared by computer-aided transcription.

Elaine Hinson, RMR, CCR
United States Court Reporter

A094

Appellate Case: 19-3576    Page: 95    Date Filed: 12/04/2019 Entry ID: 4858509

note that the defendant has been the beneficiary of several agreements and understandings. There's been, upon his pleading guilty to Count 1, two other counts were dropped. The government has entered certain stipulations and agreements in the plea agreement, which we mentioned. Now they've filed a 5K1. So what should I do about the 5K1 first?

The sentencing range that we are dealing with here is with a level of 23 and a criminal history category of II is 51 months to 63 months. I guess the mean, the average, was around 57 or 58 months. So a fourth, I'm going to give him a credit of a fourth upon the motion of the government from the mean, so a fourth of 58, let's see, looks like 14 1/2 months, if you reduce it from the mean of 58, would be 44 1/2 months.

I might say that if this were not a guideline case, this Court would be imposing a much heavier sentence in this case, probably not so much revealed in the presentence report, but in the overall picture that the Court has. What we are dealing here with is the man who is the father of Chevie Kehoe, who essentially raised Chevie Kehoe. And he can't be totally responsible for how he turned out, but he certainly is a major factor in his child's life. He is a participant in the charge that he's convicted of here with his son with this racketeering, most serious racketeering count. But the Congress has told us that they want the sentencing guidelines. They've told us that they want the government to have the

Appellate Case: 19-3576     Page: 96     Date Filed: 12/04/2019  Entry ID: 4858509

leverage of making motions for downward reductions, because they feel that in the overall interest of law enforcement they can get cooperation from witnesses that they couldn't otherwise get cooperation from. And they expect, I think, the courts to honor their understanding of how the guidelines should work in that area. So I am accepting that. And I am giving a credit on that basis.

Now, let me ask this. There's been a request. I want to hear from the government. The presentence -- the plea agreement, if I can find it, suggests that the government would recommend, if it's appropriate under the guidelines, that the sentence be concurrent with the sentence he's serving in the state of Washington, out of the state of Washington. I will hear from the parties on that. But my inclination is not to do that. The ordinary, usual way this works is that it is consecutive to, not concurrent with, the prior charges. But I will give each side an opportunity to speak to it if they want to. First, the government.

MR. STRIPLING: Your Honor, as the Court has stated, as part of our plea agreement, we did advise the defendant that we would request of the Court that the sentences be served concurrently, insofar as it's possible that they can be served concurrently. I suppose that's the key issue here.

THE COURT: That's the key issue. It's beyond that, because it also has to be with my agreement. Even if it is

Appellate Case: 19-3576    Page: 97    Date Filed: 12/04/2019 Entry ID: 4858509

possible, I still have to agree to it. I will get to that point later.

MR. STRIPLING: I have reviewed the guidelines. 5G1.3 covers this. My review of the guidelines indicates that clearly (a) is not applicable. That's the first condition, where someone commits a crime while they are out from release on another crime, a parolee or something like that. Section (b) of that guideline is the circumstance under which the Court is required to sentence concurrently. And, again, I don't think, from my reading of the law, that that's applicable here, because there is a requirement there that the existing sentence fully take into account what's taking place here, and certainly that's not occurred. Your Honor, all that's left is section (c). Section (c) is a policy statement. As I read section (c), it says that the Court can do whatever it wants to under these circumstances. I think that's the situation that we are in, Your Honor.

THE COURT: Mr. Aydelott, do you have anything to say?

MR. AYDELOTT: Yes, sir.

THE COURT: You may speak to it.

MR. AYDELOTT: I agree with Mr. Stripling. This is the applicable section. I do agree that you have the authority under section (c) to run all of, part of, or none of this sentence consecutive. The purpose of putting on the testimony

Appellate Case: 19-3576     Page: 98     Date Filed: 12/04/2019 Entry ID: 4858509

about Mr. Kehoe's health goes to this issue, Your Honor. I firmly believe that Mr. Kehoe may not survive his current prison sentence. I am asking the Court on his behalf to run, if not all of it, a significant portion of it concurrent with his present 51-month sentence which has already been imposed and has already started.

Mr. Kehoe cannot help his medical condition. It existed far before he was involved in this situation. It occurred during service to his country. As a Vietnam veteran, he is one of a handful that are suffering from this particular form of skin cancer. It's ironic that the same country that he fought for is now having him incarcerated and somehow cannot find the resources to treat him for this condition. I think the Court is in a position to send a message to the BOP. Run some portion of this concurrent, and quite possibly give Mr. Kehoe an opportunity to survive this sentence. I am asking for that consideration.

THE COURT: Well, I am not going to do that. He is the substantial beneficiary of the entire prosecutorial process. This sentence of 44 1/2 months, considering the nature of the crime charged here, is so minimal that it doesn't -- I see no possible basis for running it concurrently with the sentence he is presently serving.

Now, with respect to his medical condition, he, as every other prisoner, has the right to have his medical condition

Appellate Case: 19-3576     Page: 99     Date Filed: 12/04/2019 Entry ID: 4858509

# EXHIBIT E

**A099**

Declaration of Tanna Hoecher

1. My name is Tanna Hoecher. I am married to Tim Hoecher. We live in a rural area of northeast Washington state. I was formerly married to Cheyne Kehoe, who is the father of my two eldest children.

2. I married Cheyne in 1995 after knowing him a fairly brief period of time. I was 18 years old at the time. He was very good-looking and very charming, as was his older brother, Chevie.

3. I have two children by Cheyne. One was born in 1996, while we were together. I was pregnant with the other when Cheyne turned himself in. He has been in prison off and on ever since.

4. For the sake of my children, I initially maintained some contact with Cheyne's parents, Kirby and Gloria Kehoe. However, Kirby behaved in a threatening manner towards my father at one point, and I have had no contact with him since then. My children have maintained very limited contact with Gloria, which I have permitted because she is their grandmother, and I consider that the right thing to do.

5. I testified in Arkansas at the murder trial of Chevie and Danny Lee. As I recall it, I talked in my testimony primarily about the time I spent traveling with Cheyne, and Chevie and his wife, Karenna, and their children, during the time leading up to a shootout Cheyne and Chevie had with the police in Ohio. I also described the time period following the shooting, when Cheyne and Chevie were on the run from the police, and about Cheyne's eventual decision to turn himself into the police.

6. I was considered an outsider by the Kehoe family so no one ever spoke to me about the circumstances of the Mueller murders. I cannot speak to anything about those at all.

7. But once Cheyne had turned himself in, I remember going back to my parents' house and just sleeping for five days straight. It was an incredible relief to have food, a bed and not to spend every moment in constant fear. When living with the Kehoes, for nearly a year, the only contact I was allowed were three short phone calls, near the time I had left my parents' home. All of these phone calls were supervised by Cheyne.

8. It took me several months to again feel comfortable and safe in my family home. It took me years to fully realize how bizarre and depraved my life had been while living with the Kehoe family.

9. At some point a couple of years after returning to my family home, my parents brought up the idea that they thought I had been brainwashed. I was initially surprised at this. I never felt that I had been deliberately forced to believe as the Kehoes. Rather, I adapted to their way of life and did what I did to get through the days as a matter of survival.

10. The Kehoes were a charming lot on first impression, and acted with extreme politeness to me and to one another. Until one got to know them at a deeper level, I think it's easy to be impressed by them. Based on what I know of the Chevie's ex-wife, she seemed to fit the same

Appellate Case: 19-3576    Page: 101    Date Filed: 12/04/2019 Entry ID: 4858509

**A100**

general type that I was – young, naïve, vulnerable.  Even being the oldest of ten children, as I am, I still got drawn in by that family.

11. One thing I understand that was talked about at trial that just doesn't seem to have been true. That is, I know Chevie and his family were accused of committing crimes to finance a white supremacist organization.

12. I never saw any evidence of that and don't believe it's true.  The Kehoes lived in almost complete isolation and didn't seem to have any friends and didn't seem to be part of any organization.

13. In addition, whatever money they got, by whatever means, was used for their own benefit.  I lived in the same trailer with Chevie's family, for example, for months on end and, every time he got any money, he spent it on himself and his family.  When he had a decent amount of money, he spent it on things that seemed frivolous to me.  But I saw no evidence that he was giving his money to any kind of organization or using it to promote any  separatist type of organization or philosophy.   The money lined his own pockets, no one else's.  Chevie was all about Chevie.

I declare under penalty of perjury that the foregoing is true and correct to the best of my recollection.

*Tanna Hoecher*

Tanna Hoecher

Date: *September 21, 2016*

Addy, Washington

Appellate Case: 19-3576    Page: 102    Date Filed: 12/04/2019 Entry ID: 4858509

**A101**

# EXHIBIT F

IN THE DISTRICT COURT OF THE FIRST JUDICIAL DISTRICT

OF THE STATE OF IDAHO, IN AND FOR THE COUNTY OF BONNER

\* \* \* \* \* \* \*

STATE OF IDAHO,

   Plaintiff,

  vs.         Case No. CRF-96-1506

FARON E. LOVELACE,

   Defendant.

---

AT:   Bonner County, Sandpoint, Idaho

ON:   September 8 through 11, 1997

BEFORE: The Honorable James F. Judd, District Judge

APPEARANCES:

 For the Plaintiff: Dennis E. Charney
         J. Scott James
         Idaho Attorney General's Office
         Statehouse, Room 210
         Boise, ID 83720-1000

 For the Defendant: Faron Lovelace, Pro Se
         No. 53328, IMSI-B, Death Row
         P. O. Box 51
         Boise, ID 83707

376

**A103**

Appellate Case: 19-3576 Page: 104 Date Filed: 12/04/2019 Entry ID: 4858509

years with the Federal government. I'm facing a couple lifes and thirty years, I believe, by the Federal government. I'm under investigation today for possible -- the Rico investigation, which is organized crime. I've told at least one investigator it's ridiculous.

I will not be in the future denying any guilt in the Washington case in which one witness has testified to today that involved that. There's a mandatory life sentence without parole, but that's yet an untried case, and that's why testimony was limited by that witness.

There's probably things I should say right now that I can't think to say, and probably things I said that I shouldn't have said, but here I am. I'm a liar, I'm a killer and/or murderer. I'm a violator of the law ancient and present. The last thing to yield up here is my pride. That's not going to be difficult to do.

And I can't think of anything, but I'd like to ask my advisor if he can think of anything. Can you?

(BRIEF PAUSE.)

MR. LOVELACE: I've been advised that I should reveal a little bit more as to why the killing occurred, and where it occurred.

I recently gave a new confession to my attorney Monday that the government has been after for a long time. And he is now convinced that that's what happened. At no

447

**A104**

Appellate Case: 19-3576    Page: 105    Date Filed: 12/04/2019 Entry ID: 4858509

# EXHIBIT G

**A105**

FILED
IN OPEN COURT

MAY 4 1999
Marge Higginbotham
U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

## VERDICT FORM FOR COUNT I, DEFENDANT LEE

We, the jury, find the Defendant Daniel Lewis Lee _____Guilty_____ of the
guilty/not guilty

crime of participating in a racketeering enterprise as charged in Count I of the Superseding

Indictment.

If you find the Defendant Daniel Lewis Lee guilty of Count I beyond a reasonable doubt,

check the predicate acts you unanimously found to have been proven with respect to the Defendant

Daniel Lewis Lee.

| Racketeering Act Number | Act | Check if Applicable |
|---|---|---|
| 4A | First Degree Murder of William Mueller | ✓ |
| 4B | Aggravated Robbery of William Mueller | ✓ |
| 4C | Interstate Transportation of Stolen Property | ✓ |
| 5 | First Degree Murder of Nancy Mueller | ✓ |
| 6 | First Degree Murder of Sarah Powell | ✓ |
| 7 | First Degree Arson (Bombing) Spokane, Washington | |

_____5-4-99_____
Date

Juror #100
Foreperson

810

A106

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

## VERDICT FORM FOR COUNT II, DEFENDANT LEE

We, the jury, find the Defendant Daniel Lewis Lee _____Guilty_____ of the

guilty/not guilty

crime of conspiring to participate in a racketeering enterprise as charged in Count II of the

Superseding Indictment.

_____5-4-99_____
Date

Juror #100
Foreperson

Appellate Case: 19-3576    Page: 108    Date Filed: 12/04/2019    Entry ID: 4858509

**A107**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
IN OPEN COURT
MAY 4 ~ 1999
U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

### VERDICT FORM FOR COUNT III, DEFENDANT LEE

We, the jury, find the Defendant Daniel Lewis Lee _____Guilty_____ of the

                                        guilty/not guilty

crime of murder in aid of racketeering, specifically the William Mueller murder, as charged in Count

III of the Superseding Indictment.

_____5-4-99_____
Date

Juror #100
Foreperson

Appellate Case: 19-3576    Page: 109    Date Filed: 12/04/2019   Entry ID: 4858509

**A108**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

FILED
IN OPEN COURT

MAY 4 ~ 1999

U.S. DISTRICT COURT
EASTERN DISTRICT OF ARKANSA

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

### VERDICT FORM FOR COUNT IV, DEFENDANT LEE

We, the jury, find the Defendant Daniel Lewis Lee _____Guilty_____ of the

                                               guilty/not guilty

crime of murder in aid of racketeering, specifically the Nancy Mueller murder, as charged in Count

IV of the Superseding Indictment.

_____5-4-99_____

Date

Juror #100
Foreperson

**A109**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(2)

DANIEL LEWIS LEE,
a/k/a Daniel Lewis Graham, et al.

### VERDICT FORM FOR COUNT V, DEFENDANT LEE

We, the jury, find the Defendant Daniel Lewis Lee _____*Guilty*_____ of the
                                                        guilty/not guilty

crime of murder in aid of racketeering, specifically the Sarah Powell murder, as charged in Count

V of the Superseding Indictment.

_____5-4-99_____
Date

*Juror #100*
*Foreperson*

Appellate Case: 19-3576   Page: 111-   Date Filed: 12/04/2019 Entry ID: 4858509

**A110**



5/1 - 268 6791

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                No. LR-CR-97-243(1)

CHEVIE O'BRIEN KEHOE,
a/k/a Bud, et al.

## <u>VERDICT FORM FOR COUNT I, DEFENDANT KEHOE</u>

We, the jury, find the Defendant Chevie O'Brien Kehoe _____ *Guilty* _____ of the
guilty/not guilty

crime of participating in a racketeering enterprise as charged in Count I of the Superseding

Indictment.

If you find the Defendant Chevie O'Brien Kehoe guilty of Count I beyond a reasonable

doubt, <u>check the predicate acts</u> you unanimously found to have been proven with respect to the

Defendant Chevie O'Brien Kehoe.

| Racketeering Act Number | Act | Check if Applicable |
|---|---|---|
| 1 | Interstate Transportation of Stolen Property | ✓ |
| 2A | Conspiracy Friedman Robbery | ✓ |
| 2B | Robbery First Degree – Jill and Malcolm Friedman | |
| 2C | Money Laundering | |
| 3 | First Degree Murder of Jeremy Scott | |

**A111**



| 4A | First Degree Murder of William Mueller | ✓ |
|---|---|---|
| 4B | Aggravated Robbery of William Mueller | ✓ |
| 4C | Interstate Transportation of Stolen Property | ✓ |
| 4D | Possessing, Concealing, Storing, Selling and Disposing of Stolen Goods | ✓ |
| 4E | Money Laundering | ✓ |
| 5 | First Degree Murder of Nancy Mueller | ✓ |
| 6 | First Degree Murder of Sarah Powell | ✓ |
| 7 | First Degree Arson (Bombing) Spokane, Washington | |
| 8 | First Degree Murder of Jon Cox | |
| 9A | Attempted Murder of Robert Martin | ✓ |
| 9B | Attempted Murder of Rick Wood | ✓ |
| 10 | Interstate Transportation of Stolen Vehicle | ✓ |

5-4-99
_____
Date

-2-

Appellate Case: 19-3576     Page: 113     Date Filed: 12/04/2019 Entry ID: 4858509

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                           No. LR-CR-97-243(1)

CHEVIE O'BRIEN KEHOE,
a/k/a Bud, et al.


## <u>VERDICT FORM FOR COUNT II, DEFENDANT KEHOE</u>


We, the jury, find the Defendant Chevie O'Brien Kehoe _____Guilty_____ of the

                                            guilty/not guilty

crime of conspiring to participate in a racketeering enterprise as charged in Count II of the

Superseding Indictment.


_____5-4-99_____

Date

Appellate Case: 19-3576     Page: 114     Date Filed: 12/04/2019 Entry ID: 4858509

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(1)

CHEVIE O'BRIEN KEHOE,
a/k/a Bud, et al.

### VERDICT FORM FOR COUNT III, DEFENDANT KEHOE

We, the jury, find the Defendant Chevie O'Brien Kehoe ____Guilty____ of the

                                                        guilty/not guilty

crime of murder in aid of racketeering, specifically the William Mueller murder, as charged in Count

III of the Superseding Indictment.

____5-4-99____

Date

**A114**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                          No. LR-CR-97-243(1)

CHEVIE O'BRIEN KEHOE,
a/k/a Bud, et al.

### VERDICT FORM FOR COUNT IV, DEFENDANT KEHOE

We, the jury, find the Defendant Chevie O'Brien Kehoe _____*Guilty*_____ of the

guilty/not guilty

crime of murder in aid of racketeering, specifically the Nancy Mueller murder, as charged in Count

IV of the Superseding Indictment.

_____*5-4-99*_____

Date

**A115**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

UNITED STATES OF AMERICA

v.                                    No. LR-CR-97-243(1)

CHEVIE O'BRIEN KEHOE,
a/k/a Bud, et al.


## <u>VERDICT FORM FOR COUNT V, DEFENDANT KEHOE</u>


We, the jury, find the Defendant Chevie O'Brien Kehoe _____Guilty_____ of the

guilty/not guilty

crime of murder in aid of racketeering, specifically the Sarah Powell murder, as charged in Count


V of the Superseding Indictment.


_____5-4-99_____

Date


**A116**